IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| THE PROCTER & GAMBLE COMPANY, | : | |
| | : | Case No. 1: 02cv393 |
| Plaintiff/Counterclaim Defendant, | : | |
| vs. | : | District Judge Walter Herbert Rice |
| | | Magistrate Judge Sharon L. Ovington |
| THE COCA-COLA COMPANY, | : | |
| Defendant/Counterclaim Plaintiff. | : | |

## DISCOVERY ORDER

### I.    INTRODUCTION

Plaintiff/Counterclaim Defendant The Procter & Gamble Company ("P&G") owns a patent for "Fruit Juice Beverages and Juice Concentrates Nutritionally Supplemented with Calcium," U.S. Patent No. 4,722,847 ("the '847 patent"). (Doc. #34, Exhibit A at 1). P&G claims that a number of The Coca-Cola Company's ("Coca-Cola's") juices infringe the '847 patent. Coca-Cola seeks declaratory judgment holding, among other things, that its accused products do not infringe the '847 patent.

This matter is before the Court upon P&G's Motion to Compel (Doc. # 34), Coca-Cola's Memorandum in Opposition and Cross Motion for Protective Order (Doc. #39), P&G's Response (Doc. #44), and Coca-Cola's Reply (Doc. #47). On November 7, 2003, the Court held a hearing

during which the parties, through counsel, presented oral arguments.

P&G seeks to learn the flavoring formulas Coca-Cola uses in manufacturing the accused products. Consistent with "[t]he impregnable barriers"[1] Coca-Cola historically erects to protect its trade secrets, Coca-Cola argues in this case with the utmost vigor, within the bounds of professionalism and the law, that P&G must be prevented from learning the flavoring formulas.

## II.    FACTUAL BACKGROUND

### A.    The '847 Patent

P&G explains in its Second Amended Complaint that prior to the '847 patent's disclosure of fruit juices nutritionally supplemented with calcium, inventors had unsuccessfully attempted to add calcium to fruit juices at levels sufficient to provide a viable alternative to milk. (Doc. #42 at 2). The lack of success occurred, according to P&G, "at least in part because the added calcium failed to stay solubilized in the juice and/or adversely affected the color and taste of the product. The '847 patent enabled practitioners for the first time to produce a calcium-supplemented fruit juice beverage that was both nutritious and appealing to the consumer." (Doc. #42 at 2).

Claim 1 of the '847 patent is an independent Claim disclosing, "A calcium-supplemented single-strength fruit juice beverage, which is substantially free of added protein..." (Doc. #34, Exh. A at col. 13). Claim 1 is comprised of several elements the most significant of which for present purpose is Claim element 1(b):

> from about 0.4 to about 4% by weight of an acid component **comprising** a mixture of citric acid and malic acid in a weight ratio of citric acid: malic acid from about 5:95 to about 90:10.

---

[1] *Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Company*, 107 F.R.D. 288, 289 (D. Del. 1985).

(Doc. #34, Exh. A at col. 13)(emphasis added).

P&G seeks to discover information about Coca-Cola's accused products – particularly the formulas of certain alleged flavoring oils and essences – to show, in part, that the accused products cover Claim element 1(b).

### B.     Coca-Cola and The Minute Maid Company

Coca-Cola is a Delaware corporation with its principal place of business in Atlanta, Georgia. Coca-Cola acquired the Minute Maid Company in 1960. (Doc. #39 at n.1). The Minute Maid Company, headquartered in Houston, Texas, is a division of Coca-Cola. "As a leading beverage producer, The Minute Maid Company markets and sells a variety of beverages ... throughout the United States." (Doc. #21 at 5).[2]

Coca-Cola emphasizes that in the food and beverage industry, virtually all the major companies – including Coca-Cola – "zealously guard the flavoring ingredients to their recipes and formulas as trade secrets." (Doc. #39 at 4). Coca-Cola therefore seeks a protective Order barring P&G from ever discovering its flavoring formulas.

### III.     DISCOVERY BACKGROUND

### A.     P&G's Discovery Responses

At the outset of discovery, Coca-Cola submitted an Interrogatory to P&G seeking to learn

---

[2] The Minute Maid beverages accused of infringing the '847 patent include the following: Minute Maid Premium Calcium Original (in single-strength and frozen concentrated forms); Minute Maid Premium Calcium Home Squeezed Style (in single-strength and frozen concentrated forms); Minute Maid Premium Blends (in single strength and frozen concentrated forms); Minute Maid Premium Juices and Cocktails (in frozen concentrated form); Simply Orange™ Orange Juice Plus Calcium; Minute Maid Juices to Go (16 oz. Single Serve) Orange Juice Plus Calcium; Odwalla 100% Essential Juices Glorious Morning; Disney 100 Acre Wood™ 100% Juices; and Minute Maid Juice Boxes. (Doc. #42 at 4).

P&G's element-by-element claim construction along with the basis for its infringement contentions. (Doc. #39, Exh. 7 at 5). P&G in response asserted that Minute Maid calcium-supplemented 100% orange juice from concentrate satisfied Claim element 1(b) of the '847 patent because it contained "a range of 1.2-1.7 wt. % acid component." (Doc. #39, Exh. 7, claim construction chart at 1). P&G explained that the '847 patent's specification describes the "acid component" in Claim element 1(b) "as the total acid including both natural and added acids in both undissociated (free acid) and dissociated (salt) forms...." *Id*.

Coca-Cola maintains that P&G "identified calcium, citric and malic acids, fruit juice, sugar, and chloride ion as claim elements, but never asserted that any flavoring ingredients, such as oils or essences, were part of its basis for alleged infringement. Nor did P&G assert that the presence of any specific kinds of flavors is otherwise relevant to any claim or defense." (Doc. #39 at 5). Coca-Cola further contends that P&G, in its present Motion to Compel, has reversed its infringement positions by "adopt[ing] the notion that virtually all ingredients, particularly Minute Maid's flavoring trade secrets, were 'highly relevant' to the issue of infringement." (Doc. #39 at 5). Coca-Cola further contends that there is no scientific or legal basis for P&G to insist on the disclosure of Coca-Cola's flavoring trade secrets.

### B.    Coca-Cola's Discovery Responses

P&G's Interrogatory No. 12 sought to learn the basis of Coca-Cola's noninfringement contentions. (Doc. #34, Exh. B at 14). Coca-Cola answered that the accused beverages "do not meet the citric acid:malic acid ratio limitation of the asserted claims of the '847 patent because such identified accused beverages do not comprise any added citric or malic acid. These claims require that a mixture of both citric acid and malic acid be added to the juice product." (Doc. #34, Exh. B

at 14-15).  Coca-Cola further answered, "This infringement defense is dispositive of all asserted claims."  *Id*. at 15.

P&G also sought documents from Coca-Cola relating to its noninfringement contentions as well as "material data sheets accompanying any of the Accused Products."  (Doc. #34, Exh. C at Request Nos. 2, 23).  P&G further requested the production of the following:

> All documents relating to any changes in the formulation or production of the Accused Products, including but not limited to any consideration, analysis, study, investigation, or testing of any such changes, whether or not such changes ever were implemented.

(Doc. #34, Exh. C at 16).  In response to this request, Coca-Cola either declined to produce responsive documents or produced redacted documents.  Coca-Cola justified its restricted production in part on the ground that the request for production "seeks information that is not reasonably calculated to lead to the discovery of admissible evidence, and that is not otherwise within the scope of Rule 26 of the Federal Rules of Civil Procedure."  (Doc. #34, Exh. C at 16).

## IV.    ANALYSIS

### A.    The Parties' General Contentions

P&G seeks an Order compelling Coca-Cola to produce unredacted documents containing information about the identity and quantities of certain flavoring oils and essences Coca-Cola adds to the accused products.

Coca-Cola contends that P&G is attempting to learn Coca-Cola's trade secrets protected from discovery by Fed. R. Civ. P. 26(c)(7).  Coca-Cola asserts that it "has provided an unrefuted demonstration that its formulas are (1) highly valued trade secrets; (2) irrelevant to the '847 patent claims; and (3) should not be divulged to an adversary based entirely upon unfounded suspicions."

(Doc. # 47 at 3).

### B.    Relevancy and Trade Secrets

In general, "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...."  Fed. R. Civ. P. 26(b)(1).  Once a request for discovery strays outside of an area "relevant to a claim or defense...," Rule 26(b)(1) requires a showing of "good cause" as follows:

> For good cause shown, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

For good cause shown, the Court may limit or prohibit altogether a party from discovering the trade secrets or other confidential research, development or commercial information of an opposing party.  Fed. R. Civ. P. 26(c)(7).

> In determining whether ... 'trade secrets' must be disclosed, courts apply a burden-shifting analysis....  The party from whom the discovery is sought bears the initial burden of establishing that the information is a 'trade secret' and that its disclosure could be harmful.  The burden then shifts to the requesting party to establish that the information is both relevant and necessary to the pending action....  Finally, the court must balance the need for the information against the possible harm of disclosure.

*Allen v. Howmedica Liebinger*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999)(citations omitted).

Considering the possible harm caused by court-ordered disclosure requires recognition of the hidden nature of trade secrets:  "a trade secret, as a tool for commercial competition, derives much of its value from the fact of its secrecy.  It is truly valuable only so long as it is a secret, for only so long does it provide an advantage over competitors." *E.I. DuPont Nemours v. United States*, 288 F.2d 904, 911 (Fed. Cir. 1961).

6

C.    **P&G's Motion to Compel Coca-Cola's Trade Secrets**

P&G acknowledged during oral argument that the formulas it seeks constitute trade secrets. The burden therefore falls on P&G to show that the formulas are both relevant and necessary.  *See Howmedica Liebinger*, 190 F.R.D. at 525.

## 1.
### Relevancy

Determining whether the trade secrets P&G seeks are relevant under Rule 26(b)(1) requires consideration of what P&G must prove to establish infringement.  "Victory in an infringement suit requires a finding that the patent claim 'covers the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean."  *Markman v. Westview Instruments Inc.*, 517 U.S. 370, 374 (1996).  The first step of the infringement analysis, construing the claims, is a question of law "exclusively within the province of the court."  *Markman*, 517 U.S. at 372.  The second step of the infringement analysis, comparing the claims to the accused devices, presents factual questions.  *Karlin Technology, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999).

P&G begins its relevancy analysis by pointing to Coca-Cola's noninfringement contention that its accused products do not contain any added citric or malic acid, and as a result, they do not cover Claim element 1(b).  P&G reasons that if Coca-Cola adds acid-containing ingredients to its accused products, then Claim element 1(b) may be satisfied.  P&G therefore concludes that its search for acid-containing ingredients seeks relevant information or that its requests for the flavoring formulas used by Coca-Cola in the accused products are reasonably calculated to lead to the discovery of admissible evidence.

Coca-Cola contends that as a matter of basic chemistry, its accused products do not contain

citric or malic acid. Coca-Cola maintains that it has revealed this by identifying for P&G the ingredients in its accused products.

There appears to be no genuine dispute at this point in the case over the fact that the flavoring ingredients at issue in Coca-Cola's accused products do not contain citric or malic acid. Coca-Cola presents the Declarations of two experts – Laszlo Somogyi, Ph.D. and Robert J. Braddock, Ph.D. – to show this, and P&G's expert, Robert A. Baker, agrees. (Doc. #44, Exh. 1 at 2). Thus, at least for present purposes the record does not contain a dispute over the fact that as a matter of basic chemistry, Coca-Cola's accused products do not contain citric or malic acid.

However, this does not end the relevancy analysis because P&G simply does not know – and seeks to learn – if the accused products contain other acids sufficient to cover Claim element 1(b). P&G thus raises two additional points: (1) Coca-Cola's accused products may contain organic acids other than citric and malic acids; and (2) other organic acids can cover the particular language used in Claim element 1(b).

As to point 1, P&G argues that it is not merely speculating about the presence of other organic acids in the accused products. This contention is well taken because P&G again relies on its expert, Baker, who states that neither Dr. Somogyi nor Dr. Braddock "addresses the question of whether other organic acids might be present." (Doc. #44, Exh. 1 at 2). Baker further maintains that Drs. Somogyi and Braddock did not consider whether Coca-Cola's flavoring ingredients contain "aqueous essence," a flavor fraction derived from citrus processing which can be used for flavoring, like citrus and malic acids. *Id*. at 3. Baker opines, "if orange aqueous essences were being used by Coca-Cola to enhance the flavor of the accused products, some small amount of organic acid would be added." *Id*. at 4. In light of Baker's opinions, P&G has shown an evidentiary basis for believing

that Coca-Cola's formulas may contain some organic acid other than citric or malic acid.

As to point 2, P&G contends that Claim element 1(b)'s use of the term "comprising" means, in patent lexicon, "including but not limited to" citric or malic acid. Given this claim language construction, P&G reasons that information about the presence of other organic acids in Coca-Colo's flavoring formulas is relevant to showing that the accused products cover Claim element 1(b).

This contention appears to be well taken in light of the Federal Circuit's recognition that "[t]he transitional term 'comprising' ... is inclusive or open-ended and does not exclude additional, unrecited elements or method steps." *Georgia Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1327 (Fed. Cir. 2000)(footnote citations omitted). Yet, P&G's showing of relevancy hinges on a particular construction of Claim element 1(b), a premature undertaking at this point in the case prior to the close of discovery and the District Judge's resolution of any claim language disputes.[3] Despite this, P&G has met its burden to show relevancy.

Under Rule 26(b)(1), relevancy is measured objectively: Is P&G's request for Coca-Cola's flavoring formulas reasonably calculated to lead to the discovery of admissible evidence? Considering this alone – without yet contemplating the potential harm to Coca-Cola – P&G has shown that its request for the formulas seeks relevant information or is reasonably calculated to lead to the discovery of admissible evidence. P&G's proposed construction of Claim element 1(b) use of the term "comprising" has some support in Federal Circuit case law, *see Georgia Pacific*, 195 F.3d at 1327, and if the proposed construction is adopted by the parties or the District Judge, information about the existence of organic acids other than citric or malic acid in the flavoring

---

[3] This Judicial Officer cannot hold as a matter of law that Claim element 1(b)'s use of the term "comprising" must be construed to include acids other than citric and malic acids. Such a holding prior to the claim construction phase of this case would be premature. In addition, resolving issues of claim language construction is outside the mandate of the District Judge's limited referral of discovery disputes in this case, *see* Doc. #29.

formulas would shed light on whether or not Coca-Cola's accused products cover Claim element 1(b).

During oral argument, Coca-Cola's counsel contended that the broad definition of relevancy applicable under Rule 26(b)(1) at the beginning of discovery narrows as the parties focus their contentions on how the accused products do or do not infringe the '847 patent. There is some appeal to this argument since relevancy is related to the specific infringement issues and defenses in a given patent case, which typically (and hopefully) narrows as discovery progresses. However, it is the broad concept of relevancy under Rule 26(b)(1) that drives discovery; a concept that remains constant even as the parties narrow the issues. Consequently, although the parties have begun to focus their claims and defenses, P&G has satisfied Rule 26(b)(1) by asserting, with evidentiary support, that the accused products' flavoring formulas may contain organic acids other than citric or malic acid.

In addition, Rule 26(b)(1) does not permit Coca-Cola to decline to produce discovery based on its unilateral determination that its flavoring formulas do not contain organic acids sufficient to cover Claim element 1(b). This is so not only because the substance of Rule 26(b)(1) generally prohibits a party from declining to produce discovery based on its own unilateral relevancy determination, but also because P&G's expert, Baker, has opined that Coca-Cola's relevancy analysis and conclusion are incomplete due to Coca-Cola's experts' failure to consider whether organic acids other than citric or malic acid are present by way of the possible addition of aqueous essence.

Accordingly, P&G has met its Rule 26(b)(1) burden of showing that its requests for Coca-Cola's flavoring formulas seek relevant information or are reasonably calculated to lead to the

discovery of admissible evidence.

## 2.
## Need

P&G seeks a broad Order compelling "Coca-Cola to immediately disclose unredacted copies of all documents containing information regarding the formulation of the Accused Products." (Doc. #34 at 8). P&G, however, has only shown that it needs information concerning organic acids other than citric or malic acid in the formulas of Coca-Cola's accused products. The need for this information exists because there does not appear to be any other way for P&G analyze whether organic acids other than citric or malic acid in Coca-Cola's accused products cover Claim element 1(b) of the '847 patent.

## 3.
## Balancing

Coca-Cola insists that the flavoring formulas at issue are more than routine trade secrets (like, for example, client lists). Flavoring formulas are the most zealously guarded trade secrets in the food and beverage industry. During oral argument, Coca-Cola's counsel explained that these secret formulas are the "warzone" of competition in this industry. Indeed, given that reverse engineering or "analytical reengineering"[4] is a reality in the industry, if outsiders learn the composition of Coca-Cola's flavoring formulas, the unique tastes of the accused products will become common. Consequently, as Coca-Cola's counsel metaphorically argued, like the bell that cannot be unrung, an Order compelling Coca-Cola to disclose these trade secrets will destroy the competitive advantage they provide Coca-Cola.

There is no doubt that Coca-Cola and/or its subsidiary Minute Maid will be harmed if its

---

[4] (Doc. #39, Exh. 5).

11

competitors learn the accused products' flavoring formulas.  Coca-Cola's Director of Regulatory

Sciences, Edison J. Geromel, describes this harm as follows:

> The trade secret information P&G is seeking is vitally important to The Coca-Cola Company because the particular type and amount of flavorings is what differentiates our products from those of our competitors in the marketplace.  This information could be used to duplicate our products, compete for our customers by essentially removing taste uniqueness, and, thereby, gain an unfair advantage in the market place.  Having invested millions of dollars in developing and protecting the flavoring trade secrets P&G seeks, the Coca-Cola Company stands to lose, for example, this substantial investment, the intangibles associated with creating market recognition for its unique flavors, and the cost associated with developing new trade secrets, if this information were disclosed....

(Doc. #39, Exh. 10).

P&G has offered no evidence in conflict with Geromel's assessment of the great harm Coca-

Cola will suffer if its competitors learn its flavoring formulas.  Indeed, as Coca-Cola argues, if its

direct competitors learn the flavoring formulas, the metaphorical bell will not only ring, as Coca-

Cola fears, it will signal the beginning of a new battle in the warzone of flavoring formulas for

shares of the fruit juice market; a battle in which Coca-Cola will lose an essential competitive

advantage – the unique tastes of the beverages at issue.

P&G acknowledges that the information it seeks constitutes trade secrets.  Yet, P&G

contends that disclosure will not harm Coca-Cola because P&G does not presently manufacture

products that compete with Coca-Cola's accused products.  While it is generally true that the

potential for harm is less when trade secrets are disclosed to a non-competitor than to a competitor,

*see Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Company*, 107 F.R.D. 288, 299

(D. Del. 1985), P&G cannot guarantee that it will never become Coca-Cola's direct competitor in

the fruit-juice market.  Knowledge of Coca-Cola's flavoring formulas would greatly benefit P&G

at least to the extent P&G could better analyze whether it should enter this competitive market.  In

addition, P&G has more than a passive non-competitor's interest in the fruit juice industry since it holds the '847 patent and since it licenses this patent to Tropicana, Products, Inc., who directly competes with Coca-Cola in the fruit juice industry.

Despite the potential for great harm to Coca-Cola that would ensue if the flavoring formulas at issue become known to its competitors in the fruit juice industry, this potential great harm does not outweigh P&G's need to discover what organic acids, other than citric or malic acid, Coca-Cola's flavoring formulas contain.  The significance of this information in this case should not be overlooked or minimized.  It goes to the heart of the parties' respective positions concerning whether any of Coca-Cola's accused products infringe the '847 patent.  Indeed, depriving P&G of this information would effectively nullify the adversary process concerning critical infringement/noninfringement issues.  As P&G correctly observes, neither P&G nor the ultimate fact finder must accept Coca-Cola's assertions blindly.  The finder of fact in particular must be given sufficient information about the flavoring formulas of Coca-Cola's accused products in order to perform the second step of the infringement analysis – comparing the accused products with the language of Claim element 1(b).  *See Karlin Technology, Inc.,* 177 F.3d at 974.

Accordingly, P&G's need for information about organic acids in the flavoring formulas outweighs the potential harm to Coca-Cola's caused by disclosure.

**4.**
**Timing and Sequence of Disclosure**

Given the great harm disclosure will potentially cause Coca-Cola if its competitors learn of the organic acids contained in its flavoring formulas, requiring Coca-Cola to disclose at this time is premature.  Disclosure will not be needed for P&G to prepare and present its claim-construction case.  The claim-construction phase may resolve the parties' dispute or may render

the information irrelevant and therefore non-discoverable.  Delaying disclosure, moreover, will

not prejudice P&G because any need for further discovery after disclosure occurs should be

minimal and accomplished in a short time.

## 5.
### Protective Order

The parties' Protective Order provides Coca-Cola with some assurance that it will not be

harmed by an Order compelling disclosure of the organic acids in its flavoring formulas.  To

bolster this assurance, P&G proposes additional protections such as permitting Coca-Cola to

produce documents reproduced on non-photocopyable paper and limiting production to specific

outside attorneys and experts.[5]

Coca-Cola maintains that the risk of irreparable harm to Coca-Cola cannot be addressed

by a Protective Order.   Coca-Cola contends that counsel's good faith intentions are insufficient

to overcome the risk of inadvertent disclosure.  According to Coca-Cola, the idea that counsel

and experts "will serve as lifelong trustees of The Coca-Cola Company's secret formulas is

entirely implausible.  Beyond that, even under the stipulated protective order, retained experts

remain free to consult in the field of the accused products and even work for direct competitors

at the same time they acquire knowledge of trade secrets."  (Doc. #39 at 14).  Coca-Cola

concludes, "There is no practical way to police the disclosure of trade secret formulas under a

protective order."  (Doc. #39 at 15).

This Judicial Officer finds that the Protective Order combined with the additional

protections proposed by P&G and the restricted information required by this Order are sufficient

---

[5]  P&G's outside counsel acknowledged during oral argument that he will need expert assistance to
understand the chemistry involved in the information.

14

to protect Coca-Cola's from potential harm.  While it is true, as Coca-Cola explains, that "Inadvertence, like a thief in the night, is no respecter of victims...,"[6] the danger of inadvertent disclosure can be minimized, if not nearly eliminated, by limiting disclosure in this case to two outside counsel and one expert and by requiring P&G to designate these individuals prior to disclosure.

P&G has already proposed Robert Baker as its designated expert.  Baker has agreed to the terms of the parties protective Order.  (Doc. #44, Exh. 1-D).  And, Baker states in pertinent part:

> [A]t no time in my career have I acted as a flavor consultant or worked on an assignment for one company involving 'reverse engineering' of its competitors' products.  I have no intentions or expectations of accepting such an engagement at any time in the future.

(Doc. #44, Exh. 1 at 4).  Baker, moreover, retired from full-time employment in 2001 after more than thirty-five years in citrus juice research.  *Id*. at 1.  Baker therefore has no present interest in revealing to Coca-Cola's competitors the types of organic acids in its flavoring formulas.

P&G's designated outside counsel would not only be bound by the parties' Protective Order and by the terms and substance of this Discovery Order, counsel are further bound by their duty as officers of this Court, a duty which extends to their law firms.

---

[6] (Doc. #39 at 14 quoting *U.S. Steel v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984)).

15

**IT IS THEREFORE ORDERED THAT:**

1.    P&G's Motion to Compel (Doc. # 34) is GRANTED in part to the extent Coca-Cola must produce responsive documents to P&G's outside counsel without redacting information about organic acid(s) contained in the accused products. P&G's Motion to Compel (Doc. # 34) is DENIED in all remaining parts.

2.    These documents will be designated "highly confidential/outside counsel only information" as defined in the Protective Order (Doc. #29). Coca-Cola's production is subject to the terms and conditions of the Protective Order with the additional requirements:

    A.    The documents must be produced on non-photocopyable paper;

    B.    Prior to production, P&G must designate two specific outside counsel to whom the documents will be produced. No other person shall have access to the documents with the sole exception of one specifically designated expert witness; and

    C.    P&G may designate Robert A. Baker – and no other – as its sole expert, to review the documents.

3.    Coca-Cola will not be required to produce the documents pursuant to this Order until the claim construction phase of this case is complete and until further Order of this Court.

4.    Meanwhile, Coca-Cola may propose additional terms or conditions to prevent disclosure beyond the three individuals designated by P&G.

5.    Coca-Cola's Cross Motion for Protective Order (Doc. #39) is DENIED to the extent that it seeks a blanket order prohibiting disclosure under any and all circumstances.


November 14, 2003

                                      s/ Sharon L. Ovington
                                      Sharon L. Ovington
                                      United States Magistrate Judge


16