# Exhibit 19

David Heckert                                    June 4, 2003
                        Cincinnati, OH

                                                        1

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF OHIO

3                     WESTERN DIVISION

                                    **CERTIFIED**
4
                                    **COPY**
5

6      - - - - - - - - - - - - - - - - - - - - - - - - -
                                            :
7      THE PROCTER & GAMBLE COMPANY,        :
                                            :
8             Plaintiff,                     :
                                            :
9        vs.                                 :      CASE NO.
                                            :      C-1-02-393
10     THE COCA-COLA COMPANY,               :
                                            :
11            Defendant.                     :
                                            :
12     - - - - - - - - - - - - - - - - - - - - - - - - -

13

14

15          Deposition of:    DAVID HECKERT

16          Taken:           By the Defendant
                             Pursuant to Subpoena
17          Date:            June 4, 2003
            Time:            Commencing at 9:14 a.m.
18          Place:           Dinsmore & Shohl
                             1900 Chemed Center
19                           255 East Fifth Street
                             Cincinnati, Ohio  45202
20          Before:          S. Diane Farrell, RMR, CRR

21                           Notary Public

22                           State of Ohio

David Heckert                                    June 4, 2003
                    Cincinnati, OH

3

1                        I N D E X

2

3      DAVID HECKERT                              PAGE

4

5          Cross-Examination by Mr. Ivey              4

6

7      EXHIBITS                      MARKED    REFERENCED

8

9          Defendant's Exhibit  1        6          6

10         Defendant's Exhibit  2       13         13

11         Defendant's Exhibit  3       43         43

12         Defendant's Exhibit  4       44         44

13         Defendant's Exhibit  5       84         84

14         Defendant's Exhibit  6      105        105

15         Defendant's Exhibit  7      112        112

16         Defendant's Exhibit  8      134        134

17         Defendant's Exhibit  9      137        137

18         Defendant's Exhibit 10      154        154

19         Defendant's Exhibit 10-a    154        154

20         Defendant's Exhibit 11      166        166
           Defendant's Exhibit 11-a    176        176
21         Defendant's Exhibit 12      186        186
           Defendant's Exhibit 13      193        193

22                          - - -

David Heckert

June 4, 2003

Cincinnati, OH

67

1    Q.    I'm sorry.

2    A.    Go ahead.  Answer -- ask your question.

3    Q.    Well, I apologize if I interrupted you.

4    A.    Ask your question.  Go ahead.

5    Q.    Okay.  You mentioned that the '847 patent

6    can be made by other methods.  Did I understand you

7    correctly?

8    A.    That's correct.

9    Q.    What other methods would allow someone to

10   make a product under the '847 patent?

11   A.    We learned after the fact that you can

12   make this without a premix.

13   Q.    Make "this," meaning the '8 --

14   A.    Make a product as described without going

15   through a premix step.

16   Q.    Okay.  And the product as described is in

17   reference to the '847 patent?

18   A.    That's correct.

19   Q.    Okay.  Could you please tell me what you

20   mean by "premix"?

21   A.    That's basically -- the method involves

22   taking the acids, making a solution of the acids,

David Heckert                                          June 4, 2003
                        Cincinnati, OH

68

1    neutralizing the calcium source in the acids to make

2    a premix, which preferably contains stabilizers.

3    That is then fed into the blend tank where the

4    juice -- concentrated juice comes in.

5          Q.    Okay.  And for the record, you motioned to

6    a diagram.  Was that on the '847 patent that you were

7    referring to?

8          A.    I motioned to the diagram, which is on the

9    front of the '963 patent.

10         Q.    All right.  And that's --

11         A.    That's what I -- that is the premix

12   method.

13         Q.    All right.

14         A.    It describes a premix.  There's a box

15   there that says, "Premix Solution."

16         Q.    I see that.

17         A.    Okay.

18         Q.    You say that you learned after the fact

19   that you could make the product in the '847 patent

20   without a premix.  Did I understand that correctly?

21         A.    That's correct.

22         Q.    When after the fact did you learn that?

David Heckert                                    June 4, 2003
                    Cincinnati, OH

69

1        A.   Let me clarify that.

2        Q.   Absolutely.

3        A.   It can be used to make a single strength

4   juice.  I'm not sure that the method can be used to

5   make the concentrates.  I think the concentrates

6   require a premix.  I -- I think that's correct.

7        Q.   All right.  So with regard to the single

8   strength product, was that what you were referring to

9   when you said you learned after the fact that it

10  could be made without a premix?

11       A.   Rather than give you a blanket statement

12  that says everything described in the product patent

13  can be made by another method, I'm distinguishing

14  between single strength and concentrates.

15            THE COURT REPORTER:  I'm sorry, can you

16       repeat that?  Rather than give you a blanket

17       statement that says everything described --

18       A.   Your question was, can the product as

19  described in the product patent, which is the '847

20  patent --

21       Q.   Yes, sir.

22       A.   -- can it be made by a method other than

David Heckert                                              June 4, 2003
                          Cincinnati, OH

70

1      the premix, okay?  To my knowledge, you're -- the

2      premix method is very important to make the

3      concentrate.  The single strength beverage, it's

4      possible to not use the premix method.

5              Q.    Okay.

6              A.    And that was learned after these patents

7      were filed and issued.  That's the best of my

8      knowledge.

9              Q.    Yes, sir.  All right.  And when you say

10     after these patents were issued, did I understand you

11     to say -- to -- to use the plural there?

12             A.    I'm not sure of the timing.  My role in

13     this was to demonstrate that the product was feasible

14     and the process would work, and at that point it was

15     handed off to somebody else.

16             Q.    All right.

17             A.    And exactly what inventions, variations

18     were made beyond that was not something that I was

19     following closely.  But at this point in time, now, I

20     am aware that there are ways to make the single

21     strength without the premix method.

22             Q.    All right.  I understand.  Let me make

David Heckert                                    June 4, 2003
                    Cincinnati, OH

                                                        73

1    '847 patent by a method other than the premix for

2    either the single strength or the concentrated juice?

3              MS. FERRERA:  Objection.

4         A.   Does it describe any other method?  Okay.

5    The '847 patent -- your question is relative to the

6    '847 patent?

7         Q.   Yes, sir.

8              MS. FERRERA:  Do you want -- do you want

9         the question repeated?

10        A.   Yes, repeat the question.

11        Q.   I'll be happy to.  Does the '847 patent

12   describe any method of making the product that's

13   claimed in the '847 patent by a method other than the

14   premix for either the single strength or the

15   concentrated juice?

16        A.   It does.  And it illustrates other methods

17   which do not work, which we attempted -- I believe we

18   attempted them; that we felt they were significantly

19   inferior to this product, to this process.

20        Q.   All right.  Let me ask you to take a look

21   at, still with the '847 patent, Exhibit Number 3, at

22   column number 4 and go down to line 57.  I'm

David Heckert                                          June 4, 2003
                        Cincinnati, OH

                                                              76

1          Q.    Okay.  And the -- if I'm understanding

2     what you were trying to convey here, it was that the

3     premix method solved problems that occurred through

4     the direct addition of calcium?

5          A.    That's correct.

6               MS. FERRERA:   Objection.

7          Q.    Okay.  As the inventor of the '847 patent,

8     if I'm understanding correctly, the objective

9     ultimately was a fortified -- a juice fortified with

10    calcium that was a drinkable fruit juice beverage, is

11    that right?

12         A.    That's correct.

13         Q.    Okay.  And would it be fair to say that

14    the experiments that are described in the disclosure

15    of this invention of direct addition of calcium into

16    juice beverages failed to work?

17         A.    That's -- yes.

18         Q.    Okay.

19         A.     In our hands at that time, with our

20    know-how, with the know-how we could get from the

21    prior art, that's correct.

22         Q.    All right.  What type of calcium was

David Heckert                                                June 4, 2003
                        Cincinnati, OH

97

1    office to perform some demonstrations.

2         A.    Yes.

3         Q.    Who was it who decided specifically what

4    kinds of demonstrations were going to be performed?

5         A.    Most likely it would have been Eric and I,

6    Eric Guttag and I.

7         Q.    Okay.  Why did you select or why were

8    you -- why did you use the demonstrations that are --

9    that are described in Mr. Dake's deposition as

10   opposed to other possible demonstrations you might

11   have made?

12              MS. FERRERA:  To the extent that that

13         requires you to discuss communications that you

14         had with Mr. Guttag, I would instruct you not

15         to answer.  If you can answer apart from that,

16         you may do so.

17        Q.    Right.  And, in fact, the only thing I'm

18   interested in is, is what was the scientific

19   objective you were trying to illustrate for the

20   examiner, in your mind, for purposes of this

21   demonstration?

22        A.    In my mind, we state in the patent that

David Heckert                                          June 4, 2003
                        Cincinnati, OH

                                                              98

1    direct addition of some of these materials leads you

2    to problems, so we set a demonstration in front of

3    the examiner and showed that that indeed was the

4    case.

5         Q.    Had the examiner expressed some skepticism

6    or disagreement with the point you were just making,

7    that direct addition was -- had problems?

8         A.    I don't recall that.  I don't remember.

9         Q.    Turning to page 3 -- I believe this is

10   paragraph 6.  And in the second full paragraph under

11   paragraph 6, it begins with Mr. Dake stating, "I

12   conducted two demonstrations involving direct

13   addition of calcium hydroxide to orange juice."  Do

14   you see where I'm reading from?

15        A.    Yes.

16             MS. FERRERA:  Is that in paragraph 7?

17             MR. IVEY:  Is that a 7?

18             MS. FERRERA:  Looks like --

19        A.    6 and 7, yeah.  It's hard to read the --

20   the copy.

21        Q.    I'll take your representation.  I'm

22   interested in the -- what it says rather than the

David Heckert                                          June 4, 2003
                        Cincinnati, OH

                                                              102

1          A.    That's correct.

2          Q.    Okay.  Of the demonstrations that Mr. Dake

3     conducted for the examiner, each of these were direct

4     addition demonstrations, were they not?

5          A.    Yes.

6          Q.    And did any of the demonstrations yield a

7     successful -- and by the word "successful," I mean as

8     you've defined the word "drinkable," juice product?

9          A.    No.

10              MS. FERRERA:  Objection.

11         Q.    Okay.  Was the objective to demonstrate

12    for the examiner that direct addition would, in fact,

13    yield a drinkable juice product?

14         A.    The demonstration was to demonstrate that

15    it would not yield a drinkable product.

16         Q.    So in -- with regard to the objective of

17    the demonstrations, you would say that each of the

18    demonstrations was successful?

19         A.    Yes.

20              MS. FERRERA:  Objection.

21         Q.    Did the examiner make any comment with

22    regard to the demonstrations that you can recall at

David Heckert                                          June 4, 2003
                        Cincinnati, OH

                                                              103

1    this point?

2           A.   We're talking about 1987 --

3           Q.   Yes, sir.

4           A.   -- 16 years ago.  I -- I -- I can't answer

5    that question sensibly.

6           Q.   Now, in paragraph 5 of the -- of the

7    declaration by Mr. Dake, "It states that the orange

8    and grapefruit juice concentrates of paragraph 4 were

9    prepared according to the premix method of the

10   present invention."  Did I read that correctly?

11          A.   Yes.

12          Q.   Is that the same premix method that is

13   described in the '847 patent?

14               MS. FERRERA:   Objection.

15          A.   Well, it says -- the words say, "according

16   to the premix method of the present invention," so I

17   read the answer as yes.

18          Q.   Was the objective of the demonstration,

19   prepared in accordance with the premix method,

20   designed to show that this was a way of solubilizing

21   calcium into juice beverages?

22          A.   Yes.

David Heckert                                                    June 4, 2003
                          Cincinnati, OH

                                                                    104

1         Q.    And also to contrast what would happen if

2    individuals were attempting to solubilize calcium

3    using another method, such as the direct method?

4              MS. FERRERA:   Objection.

5         A.    To the best of my recollection, that's the

6    point.   Again, this was 16 years ago.

7         Q.    I understand.   What happened to the -- the

8    bottles with the samples in them?

9         A.    I suspect we threw them out.

10        Q.    There were demonstrations conducted for

11   direct addition using calcium hydroxide and calcium

12   chloride, if I'm not mistaken, is that right?

13        A.    Where are you reading?

14        Q.    I see in paragraph 6 reference to

15   demonstrations to show the problem caused by direct

16   addition of calcium hydroxide and calcium -- I'm

17   sorry, calcium carbonate to orange juice or to orange

18   juice concentrate.   Did I lose you somewhere?

19        A.    No, I think I have it.

20        Q.    Okay.  I'm sorry.

21        A.    Starting at March 2nd, 1987?

22        Q.    Yes, sir.

David Heckert

June 4, 2003

Cincinnati, OH

108

1    record, that the premix procedure appeared to be

2    preferred or the only workable procedure?

3            MS. FERRERA:  Objection.

4        A.    Repeat exactly the question, please.

5        Q.    Okay.  Do you agree with the impression

6    Ms. Paden has put in the examiner interview summary

7    record, that the premix procedure appeared to be

8    preferred or the only workable procedure?

9            MS. FERRERA:  Object just to the extent

10           that you're not reading the complete sentence

11           of that section.

12       Q.    I wasn't -- okay.  My question is do you

13   agree with the conclusion that the examiner drew from

14   the demonstration?

15       A.    The only workable procedure comparing

16   direct addition, full sentence, I agree with that,

17   yes.

18           MR. IVEY:  Okay.  Why don't we stop for

19           lunch at this point?  What I guess -- I guess

20           I'd like to propose, we do this for maybe about

21           45 minutes or so and then come back.

22           MS. FERRERA:  Which would be fine.

David Heckert                                          June 4, 2003
                        Cincinnati, OH

                                                              126

1                MS. FERRERA:  Just yes or no.

2                THE WITNESS:  Excuse me?

3                MS. FERRERA:  That's just a yes or no

4        question at this point.

5        A.   Yes.

6        Q.   Who asked you to perform the tests?

7        A.   A patent attorney.

8        Q.   What product did you test?

9        A.   Minute Maid Plus Calcium.

10       Q.   Okay. Do you remember when you tested it?

11       A.   I believe it was around '93.

12       Q.   Okay.  Did you produce any kind of a

13       written report or summary of the findings from your

14       test?

15               MS. FERRERA:  Again, that's just a yes or

16       no question.

17       A.   Yes.

18       Q.   Who did you distribute the results of your

19       tests to?

20       A.   To the best of my knowledge, only the

21       attorney.

22       Q.   Was that the only time that you ever

David C. Heckert        Volume II        July 11, 2003
Cincinnati, OH

216

1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF OHIO
2             WESTERN DIVISION

3

4                                    **CERTIFIED**

5   - - - - - - - - - - - - - - - - - - - - -   **COPY**

                                          :

6   The Procter & Gamble Company,         :

                                          :

7        Plaintiffs,                      :

                                          :

8        VS.                              :    CASE NO.
                                          :    C-1-02-393

9   The Coca-Cola Company,                :

                                          :

10       Defendant.                       :

                                          :

11  - - - - - - - - - - - - - - - - - - - - -

12

13                    VOLUME II

14

15  DEPOSITION OF:    DAVID C. HECKERT

16

         TAKEN:       By the Defendant
17                    Pursuant to Notice

18  DATE:             July 11, 2003

19  TIME:             Commencing at 9:24 a.m.

20

         PLACE:       Dinsmore & Shohl
21                    19th Floor
                      255 East Fifth Street
22                    Cincinnati, Ohio  45202

David C. Heckert                    Volume II                    July 11, 2003
                                  Cincinnati, OH

218

```
 1                         I N D E X
 2

     DAVID C. HECKERT                              PAGE
 3
 4      Cross-Examination by Mr. Ivey              219
        Examination by Ms. Ferrera                 402
 5
 6   EXHIBITS                        MARKED    EFERENCED
 7      Defendants' Exhibit  14       236         236
        Defendants' Exhibit  15       393         393
 8      Defendants' Exhibit  16       346         346
        Defendants' Exhibit  17       254         254
 9      Defendants' Exhibit  18       257         257
        Defendants' Exhibit  19       300         300
10      Defendants' Exhibit  20       398         398
11
12
                              -  -  -
13
14
15
16
17
18
19
20
21
22
```

David C. Heckert                 Volume II                    July 11, 2003
                              Cincinnati, OH

293

1       question properly and whether his answer was

2       accurate.

3               So we've located it on the transcript, and

4       I'm going to ask if you could read it -- if the

5       reporter could read it back and have

6       Mr. Heckert respond.

7               (The record was read.)

8       A.    Okay.  So you've asked me, did I

9   understand that it would not work.  So I'm saying,

10  no, I have -- I can't answer that.  I had no

11  information at that time to say it would not work.

12              And, in fact, my career was based

13  frequently on taking pieces of prior art where

14  somebody said it would not work and showing that you

15  could do it.  So my position at that time would not

16  have been it would not work.  It simply would have

17  been, how do we do it.

18      Q.    So your position with regard to the direct

19  addition of calcium would have been that it would

20  work?

21      A.    That it could.

22      Q.    Could work?

David C. Heckert                    Volume II                    July 11, 2003
                                  Cincinnati, OH

294

1        A.   It's possible that it could work.  And I'd

2   have to go out and find a way to do it.  I would not

3   have taken a position that you can't do it.

4        Q.   Okay.

5        A.   That's not something I would have done, I

6   don't believe.

7        Q.   All right.  And so -- I'm sorry.

8        A.   I said I don't believe I would have said

9   that without some very strong information that said

10  you couldn't do it.

11       Q.   So did you set about to find a way to make

12  the direct addition of calcium work?

13       A.   Not at that time.

14       Q.   When did you do it?

15       A.   That was after we first did the experiment

16  with the premix method, which, as I've said before,

17  happened to be the easiest way to do it in the

18  laboratory.

19       Q.   And when you say after you --

20       A.   This was in '83.  This was this point in

21  '83.

22       Q.   All right.  So in 1983 is the time frame

David C. Heckert                 Volume II                 July 11, 2003
                                Cincinnati, OH

297

1    or the '936 patent the type of qualification you just

2    described for me, which was that a direct addition

3    doesn't work in a batch method, but that it might

4    work in some other type of method?

5              MS. FERRERA:  Objection.

6         A.   I don't remember what the words were that

7    went with the meeting with the examiner.  I -- you

8    know, I don't know if that ever got taped or

9    somebody, you know, kept track of that.  I -- I don't

10   remember if we put qualifications on it or not.

11        Q.   Did you disclose in the '847 or the '963

12   patent the steps for solubilizing calcium in a juice

13   beverage using a direct addition method?

14        A.   No, I don't believe we did.  Not that I

15   recall.

16        Q.   Why not?

17        A.   The '847 patent was a product patent.  So

18   the focus was to describe the product and then a

19   process that led to it.  It didn't particularly

20   matter what process.  The objective was the product.

21        Q.   Okay.

22        A.   The other patent --

David C. Heckert                  Volume II                    July 11, 2003
                               Cincinnati, OH

299

```
 1        Q.    And you would agree that the '963 patent

 2   lays out a method for solubilizing calcium using a

 3   premix method?

 4        A.    Yes, it does.

 5        Q.    You would also agree that both the '847

 6   and the '963 patent discuss direct addition of

 7   calcium into juice products?

 8             MS. FERRERA:   Objection.

 9        Q.    Right?

10             MS. FERRERA:   Objection.

11        A.    As I recall they did, yes.

12        Q.    And in connection with the discussion of

13   direct addition, essentially both patents disparage

14   the results when you add calcium directly into juice,

15   right?

16             MS. FERRERA:   Objection.

17        A.    Yes.

18        Q.    Okay.  So my question was, in either of

19   those patents, is there a specification of the steps

20   that one skilled in the art could use to solubilize

21   calcium in a juice beverage other than the premix

22   method?
```

David C. Heckert                    Volume II                    July 11, 2003
                                Cincinnati, OH

300

1        A.    No.   Restate the question.

2        Q.    My question was, in either of those

3    patents, the '847 or the '963 patent, is there a

4    specification of the steps that one skilled in the

5    art could use to solubilize calcium in a juice

6    beverage other than the premix method?

7        A.    That one could use or choose to use?

8        Q.    Did you lay out the steps for any other

9    method of solubilizing calcium in juice, so that

10   somebody could follow what you laid out in the

11   patent, other than a premix method?

12       A.    And come up with a juice -- good juice

13   taste -- good tasting juice product?

14       Q.    What you called a drinkable juice.

15       A.    I don't recall that we had any such thing

16   in the patent.

17       Q.    Okay.  All right.  Let me show you what

18   we'll mark for identification as Exhibit Number 19.

19             (Defendant's Exhibit 19 was marked for

20             identification.)

21       Q.    Exhibit Number 19 has "Laboratory Book

22   number VF-2092" on the top there.  Do you see that?