# Exhibit 27

Thomas P. Minnick                                                July 23, 2003

Cincinnati, OH

1

```
 1              UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF OHIO
 3                    WESTERN DIVISION
 4
 5
 6   ----------------------------------------
                                              :
 7   The Procter & Gamble Company,            :   ORIGINAL
                                              :
 8          Plaintiff,                        :
                                              :
 9      vs.                                   :   CASE NO.
                                              :   C-1-02-393
10   The Coca-Cola Company,                   :
                                              :
11          Defendant.                        :
                                              :
12   ----------------------------------------
13
14          DEPOSITION OF:    THOMAS P. MINNICK
15
            TAKEN:            By the Defendant
16                            Pursuant to Notice
17          DATE:             July 23, 2003
18          TIME:             Commencing at 8:58 a.m.
19
            PLACE:            Dinsmore & Shohl
20                            20th Floor
                              255 East Fifth Street
21                            Cincinnati, Ohio  45202
22
```

Thomas P. Minnick                                                July 23, 2003

Cincinnati, OH

3

```
 1                      I N D E X
 2
     THOMAS P. MINNICK                                PAGE
 3
 4       Cross-examination by Mr. Ivey                  4
 5
 6   EXHIBITS                              MARKED    REFERENCED
 7     Defendant's Exhibit  1                 7          7
       Defendant's Exhibit  2                 7          7
 8     Defendant's Exhibit  3                14         14
       Defendant's Exhibit  4                30         30
 9     Defendant's Exhibit  5                46         46
       Defendant's Exhibit  6                57         57
10     Defendant's Exhibit  7                61         61
       Defendant's Exhibit  8                84         84
11     Defendant's Exhibit  9                88         88
       Defendant's Exhibit 10               113        113
12     Defendant's Exhibit 11               116        116
       Defendant's Exhibit 12               130        130
13     Defendant's Exhibit 13               159        159
       Defendant's Exhibit 14               163        163
14     Defendant's Exhibit 15               175        175
       Defendant's Exhibit 16               186        186
15     Defendant's Exhibit 17               187        187
       Defendant's Exhibit 18               192        192
16     Defendant's Exhibit 19               196        196
       Defendant's Exhibit 20               200        200
17     Defendant's Exhibit 21               205        205
       Defendant's Exhibit 22               205        205
18     Defendant's Exhibit 23               220        220
       Defendant's Exhibit 24               225        225
19
20
21
22
```

                                                                    13

1    premix.

2         A.    Yes.

3         Q.    So what you have there is calcium

4    carbonate or calcium hydroxide added to citric and

5    malic acids?

6         A.    Yes.

7         Q.    The premix would then be a calcium citrate

8    malate formulation?

9         A.    Basis, the schematic on the patent, yes.

10        Q.    Okay.  And calcium citrate malate is

11   something that has been referred to at Procter &

12   Gamble in shorthand as CCM?

13        A.    Yes.

14        Q.    Okay.  And CCM was one of the

15   technologies, if I can use that word, that Procter &

16   Gamble attempted to license to various companies

17   during the 1990's.  Would that be a fair statement?

18        A.    Yes.

19        Q.    Okay.  Now, I believe at times some of the

20   correspondence from Procter & Gamble to prospective

21   companies that might license CCM, refer to a CCM

22   portfolio?

14

```
1      A.   Yes.
2      Q.   Okay.  And one of the things in that
3 portfolio would have been the '847 patent?
4      A.   Yes.
5      Q.   All right.  I'd like to show you what
6 we'll mark for identification as Exhibit Number 3.
7           (Defendant's Exhibit 3 was marked for
8            identification.)
9      Q.   Exhibit Number 3, sir, is identified as
10 4,919,963, United States Patent Number.  Do you see
11 that --
12     A.   Yes.
13     Q.   -- at the top right-hand corner?  Okay.
14 And for ease of reference, we can refer to this as
15 the '963 patent?
16     A.   Yes.
17     Q.   Again, the inventor is David Heckert?
18     A.   Yes.
19     Q.   And under the abstract, it refers to the
20 method for preparing these beverages and concentrates
21 involving forming a premix solution containing highly
22 soluble calcium citrate and malate species which is
```

```
                                                              155
```

1  the technology, we deferred.  We were handling a lot
2  of different opportunities at the same time, not just
3  CCM.
4        Q.   Okay.  In terms of the CCM portfolio,
5  approximately how many times would you say that you
6  and Mr. Andon made presentations to representatives
7  of other companies in the period of, say, 1996 to
8  1999?
9        A.   Oh, 1996, we made three.  Minute Maid,
10 Tropicana, the orange -- orange juice producer in
11 Orlando.
12       Q.   Citrus World?
13       A.   Yeah.  1997 when we were pursuing shelf
14 stable opportunities, went back after those three,
15 plus Welch and Ocean Spray and Northern Cranberry, I
16 believe; talked to maybe a couple of snack people.
17 But that was, you know -- I made a presentation to
18 GNC, maybe a couple of other mineral supplement
19 people.  But it wasn't that often.  I mean, you know,
20 I was involved with a lot of different activities.
21 This wasn't a full-time activity.
22       Q.   All right.  Now, that would have taken us,

156

1   I guess, through 1997, this next group including

2   Welch's, Ocean Spray, Northern Cranberry?

3       A.   I don't think we started on that -- we

4   signed the Trop contract in March of '97.  I'm not

5   exactly sure when Tropicana went to market.  I want

6   to say latter '97, early '98.  And if you will recall

7   earlier, we didn't necessarily have agreement from

8   our beverage group to pursue ambient opportunities.

9       Q.   "Ambient" meaning shelf stable?

10      A.   Yes.

11      Q.   Okay.

12      A.   So I think that activity really started in

13  early '98.

14      Q.   We've talked about a license that Gerber

15  took and the license that Tropicana took in kind of

16  general outline.

17      A.   Right.

18      Q.   Did any of the other companies that you

19  mentioned, Citrus World, Northern Cranberry, Ocean

20  Spray, Welch -- Welch's take licenses?

21      A.   No.  But they were all very interested and

22  we were trying to maximize which one would be most

157

1   successful. It was our choice.

2       Q.  Do you remember talking to other companies

3   about CCM technology in the 1998 time frame

4   continuing on into the future?

5       A.  I'm sure we did. You know, after we did

6   the global Trop contract, Mark and I really felt that

7   the opportunities were in the beverages. So once we

8   did a sole contract with Tropicana that pretty much

9   limited us where we were going to go.

10      Q.  Do you remember making presentations to

11  the Kraft Company?

12      A.  We tried to get them interested. I'm not

13  sure what point in time. I also think we might have

14  made a presentation to V-8 Juice, Campbell's. I'm

15  not sure of the other ones we went to.

16      Q.  General Mills?

17      A.  That was for the snack opportunity we were

18  pursuing.

19      Q.  What about Smith Kline Beecham.

20      A.  That was mineral supplements. We struck

21  the deal with GNC versus them.

22      Q.  American Home Products?

                                                                    158

1        A.   Mineral supplements.  At that time we were
2   pursuing all three.
3        Q.   And GNC was the one --
4        A.   Yeah.
5        Q.   -- that got the license?
6        A.   That got the contract.
7        Q.   And then Dannon's?
8        A.   That was yogurt, a different opportunity
9   altogether.
10       Q.   Okay.  Did a license come out of that
11  opportunity?
12       A.   No.
13       Q.   Were there any discussions about licensing
14  CCM with PepsiCo?
15       A.   We -- I don't know what year -- Al Bolles,
16  the vice president of R&D at Tropicana was
17  championing our calcium technology.  And he set up a
18  meeting with Pepsi for us -- for Mark and I to go in
19  and review the possible use of calcium in water.  And
20  we went up and made a presentation.
21       Q.   Did that result in any type of license?
22       A.   No.

                                                                    159

1      Q.   Do you remember approximately when you
2   went to Pepsi to make the presentation?
3      A.   Not the exact time frame.  I want to say
4   '98 maybe.  Maybe '99.  It was probably '98 when we
5   were still active.
6      Q.   And when you say "went up," you mean to
7   New York or New Jersey?
8      A.   Yeah, New York, the Pepsi headquarters.
9      Q.   Let's mark for identification Exhibit
10  Number 13.
11             (Defendant's Exhibit 13 was marked for
12             identification.)
13             THE WITNESS:  Thank you.
14     Q.   Mr. Minnick, this is a March 1, 1996
15  letter?
16     A.   Uh-huh, right.
17     Q.   It's directed to the attention of Dr. Ajai
18  Puri?
19     A.   Uh-huh.
20     Q.   Spelled A-j-a-i.  The second name,
21  P-u-r-i.  First it begins, Doctor, Recently, P&G has
22  made the decision to license our CCM calcium