## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

————————————————————   )
                                                        )
THE PROCTER & GAMBLE COMPANY,   )
                                                        )
                          Plaintiff,   )
                                                        )        Civil Action No. C-1-02-393
                        v.   )
                                                        )        Hon. Walter Rice (C.J.)
THE COCA-COLA COMPANY,   )        Hon. Sharon Ovington (Magistrate)
                                                        )
                          Defendant.   )
————————————————————   )


### THE PROCTER & GAMBLE COMPANY'S RESPONSE TO THE COCA-COLA COMPANY'S BRIEF ON THE MEANING OF DISPUTED CLAIM TERMS

Mark Vander Laan (Bar No. 0013297)
Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202-3172
(513) 977-8200

William F. Lee (admitted *pro hac vice*)
David B. Bassett (admitted *pro hac vice*)
Vinita Ferrera (admitted *pro hac vice*)
Mary Rose Scozzafava (admitted *pro hac vice*)
Richard W. O'Neill (admitted *pro hac vice*)
Benjamin Stern (admitted *pro hac vice*)
Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Dated: February 6, 2004

## Table of Contents

Table of Authorities ......................................................................................... iii

I.    INTRODUCTION ...................................................................................... 1

II.   COCA-COLA MISCHARACTERIZES THE INVENTION OF THE '847 PATENT ..... 2

III.  COCA-COLA'S INTERPRETATION OF THE PHRASE "ACID COMPONENT
      COMPRISING A MIXTURE OF CITRIC ACID AND MALIC ACID" VIOLATES
      EACH OF THE FEDERAL CIRCUIT'S ESSENTIAL CLAIM CONSTRUCTION
      TEACHINGS ............................................................................................... 4

      A.    Coca-Cola's Claim Interpretation Ignores The Plain Meaning Of The Word
            "Mixture" ........................................................................................... 4

      B.    Coca-Cola's Proposed Claim Construction Impermissibly Inserts Words Into
            The Claims ......................................................................................... 6

      C.    Coca-Cola's Effort To Read The Specification And The Prosecution History
            Into The Claims Constitutes An Improper Attempt To Narrow The Scope Of
            The Claims Of The '847 Patent ........................................................... 8

            1.    Nowhere in the specification of the '847 patent are there any "words
                  or expressions of manifest exclusion or restriction" disclaiming
                  products made without the addition of citric acid and malic acid ............. 9

                  a)    Coca-Cola improperly seeks to limit the claims to the preferred
                        method disclosed for making the claimed products ........................... 9

                  b)    The portions of the specification directed specifically to the
                        product claims at issue contain no reference to "added" citric
                        acid or malic acid ........................................................................ 12

                  c)    The specification confirms that P&G's proposed construction
                        is the proper one .......................................................................... 14

            2.    There is no "clear and unambiguous disavowal" in the prosecution
                  history of products in which the acid component consists exclusively
                  of naturally-present citric acid and malic acid ........................................ 16

                  a)    Coca-Cola confuses statements made in the prosecution
                        history concerning the process claims with those made
                        concerning the product claims ...................................................... 16

                  b)    Nowhere in the prosecution history did P&G assert – or even
                        suggest – that the product claims require the addition of citric
                        acid and malic acid ...................................................................... 19

D.   Statements By P&G And A Third Party In Other Patent Prosecutions Are
     Legally Irrelevant To Claim Construction And Should Not Be Considered ........ 20

E.   Coca-Cola's Arguments Concerning The Validity Of The '847 Patent Under
     P&G's Proposed Claim Construction Are Irrelevant And Improper .................... 22

IV.  THE DEFINITION OF "FRUIT JUICE BEVERAGE" IS UNDISPUTED .................... 25

V.   CONCLUSION ............................................................................................................. 26

**Table of Authorities**

## Federal Cases

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)..................................... 7

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338 (Fed. Cir. 2000) ....................... 21

*Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003) ..................................... 21

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003)................. 9, 24, 25

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69 (D. Mass. 2001), *aff'd*,
    314 F.3d 1313 (Fed. Cir. 2003)....................................................................................... 24

*Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003) ........................................ 10

*Astra Aktiebolag v. Andrx Pharma, Inc.*, 222 F. Supp. 2d 423 (S.D.N.Y. 2002) ......................... 21

*Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132 (Fed. Cir. 2003) ........................................ 11, 16

*Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294 (Fed. Cir. 2003)..................... 10

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106 (Fed. Cir. 2002) ....................... 7

*Cultor Corp. v. A.E. Staley Mfg.*, 224 F.3d 1328 (Fed. Cir. 2001) ............................................... 10

*CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997) .......................................... 16

*Glaxo Group Ltd. v. Ranbaxy Pharm., Inc.*, 262 F.3d 1333 (Fed. Cir. 2001) .............................. 21

*Golight, Inc. v. Wal-Mart Stores, Inc.*, Civ. A. No. 02-1608, 2004 WL 77933 (Fed. Cir.
    Jan. 20, 2004)................................................................................................................. 11

*Illinois Tool Works ex rel. Simco Div. v. Ion Systems, Inc.*, 250 F. Supp. 2d 477
    (E.D. Pa. 2003)............................................................................................................... 20

*In re Baker Hughes, Inc.*, 215 F.3d 1297 (Fed. Cir. 2000).......................................................... 11

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365 (Fed.
    Cir. 2002)..................................................................................................................... 8, 20

*J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360 (Fed. Cir. 2001) ....................................... 10

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) ................. 1, 7, 8

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999)......................................................... 7

*McClain v. Ortmayer*, 141 U.S. 419 (1891) ............................................................. 16

*Renishaw Plc v. Marposs Societa' Per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ............................ 8

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ................................................. 6

*Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) .................................................................... 23

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) .. 10

*Storage Technology Corp. v. Cisco Sys., Inc.*, 329 F.3d 823 (Fed. Cir. 2003) ............................ 20

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983) ............................................ 10

*Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298 (Fed. Cir. 2003) ............. 1, 11, 20

*Tate Acces Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357 (Fed.
          Cir. 2002) ........................................................................................................... 1, 23

*Tate Access Floors, Inc. v. Maxcess Technologies, Inc.*, 222 F.3d 958 (Fed. Cir. 2000) ............. 10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) ...................................... 2, 8

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ......................... 1, 5, 6

*Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295 (Fed. Cir. 1999) .................................... 11

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ....................................... 20

*VLT, Inc. v. Artesyn Technologies, Inc.*, 238 F. Supp. 2d 339 (D. Mass. 2003) .......................... 21

*Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) ....................................... 11

*Watts v. XL Systems, Inc.*, 237 F.3d 877 (Fed. Cir. 2000) ........................................................... 11

*Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668 (1921) .............................................. 16

*3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003) ...... 9, 18

## Federal Statutes

35 U.S.C. § 112 ...................................................................................................... 23, 24

35 U.S.C. §§ 120, 121 ..................................................................................................... 16

## Other Authorities

1 Donald S. Chisum, CHISUM ON PATENTS (2003) ......................................................... 2

## I.    INTRODUCTION

The Coca-Cola Company's 40-page Brief on the Meaning of Disputed Claim Terms in P&G's Patent is particularly notable in at least one aspect:  its meager discussion of the legal principles applicable to the construction of the claim terms of U.S. Patent No. 4,722,847 ("'847 patent").  The reason for this lack of discussion is apparent.  The claim construction advocated by The Coca-Cola Company ("Coca-Cola") and its purported support violate each of the cardinal principles of claim construction enunciated by the Court of Appeals for the Federal Circuit.

- First, Coca-Cola ignores the plain meaning of the claim language as elucidated by the relevant dictionary definitions.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1201-1203 (Fed. Cir. 2002).

- Second, Coca-Cola impermissibly reads extraneous words into the claims.  *See Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

- Third, Coca-Cola improperly attempts to narrow the claims by reading into them limitations from the patent specification and the prosecution history.  *See id.* at 989-990.

- Fourth, Coca-Cola inappropriately seeks to support its proposed claim construction with legally irrelevant extrinsic evidence.  *See Sunrace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1307 (Fed. Cir. 2003).

- Finally, Coca-Cola attempts to turn its brief into a summary judgment motion on the validity of the '847 patent, in direct contravention to the Federal Circuit's teaching that such analysis has no proper role at the claim construction stage.  *See Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002).

In short, Coca-Cola's "Brief on The Meaning of Disputed Claim Terms" ("Coca-Cola Br.") amounts to little more than an extended invitation to this Court to commit reversible error.  Proper adherence to the claim construction principles established by the Federal Circuit requires

the Court to reject Coca-Cola's proposed claim construction and to adopt the far simpler, more straightforward construction proposed by The Procter & Gamble Company ("P&G").

## II.    COCA-COLA MISCHARACTERIZES THE INVENTION OF THE '847 PATENT

From the very outset of its brief, Coca-Cola mischaracterizes the claims of the '847 patent by describing the invention as a ***process*** for fortifying fruit juices with calcium.[1]  Coca-Cola suggests that the invention of the '847 patent was "a ***scheme*** to solubilize calcium in a mixture of added acids and ***then add*** the resulting premix solution of solubilized calcium to the fruit juice." (Coca-Cola Br. at 3 (emphasis added).)  Coca-Cola's description of the invention is simply wrong. The invention is defined by the claims, *see Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002) ("the claims define the scope of the right to exclude") (citations omitted), and nowhere in the claims of the '847 patent is there any reference to a method for solubilizing calcium in a mixture of acids and then adding this solution to juice.

Instead, the claims and the accompanying specification make it abundantly clear that Dr. Heckert's actual invention was the recognition that, to add nutritionally significant levels of calcium to juice without negatively affecting the taste, odor, or appearance of the juice, it is necessary to control various features of the composition of the final product -- in particular, the total amount of acids as well as the relative proportions of citric acid and malic acid present. Undoubtedly, others before Dr. Heckert had recognized the ***desirability*** of adding calcium to beverages without negatively impacting the qualitative properties of such beverages, and some had even attempted to do so.  However, no one prior to Dr. Heckert had recognized that the key to successfully adding significant amounts of calcium to juice beverages and concentrates was controlling the acid composition in this manner.  As Dr. Heckert described it, although attaining

---

[1]    A "product" patent may claim a machine, composition of matter, or article of manufacture, while a "process" patent claims a way to produce a result.  1 Donald S. Chisum, CHISUM ON PATENTS §§ 1.02-1.03 at 1-11, 1-78 (2003).

the correct acid composition *may*, in some cases, involve the addition of some acids, contrary to Coca-Cola's assertions, it does not *require* it. (*See* App., Ex. 1, col. 11, lines 9-11.) [2]

Indeed, as is apparent from the plain language of the actual issued claims involved here, the '847 patent does not claim any particular process for making the products it claims. Coca-Cola's repeated reference to certain selectively excised language from the specification to support its mischaracterization of the claims of the '847 patent ignores that the '847 patent is derived from an original application that contained *both* product claims and process claims. When Dr. Heckert initially submitted his application for a patent, that application contained 28 claims, the first 18 of which were directed toward calcium-fortified juice *products* and the remaining 10 of which were directed to a *process* for making such products. (App., Ex. 9 at PGJ0013889-13893.) P&G ultimately withdrew the last 10 claims directed to the process and refiled them as a separate application that eventually issued as U.S. Patent No. 4,919,963 (the "'963 patent"). (App., Ex. 9 at PGJ0013957.)[3] When P&G withdrew the process claims, however, it left the specification unchanged, consistent with standard patent practice. Therefore, the '847 patent specification contains numerous references to the process claims that were part of the original application -- such as the statements "[t]his application further relates to a method for preparing these beverages and concentrates," (App., Ex. 1, col. 1, lines 9-11), and "[t]he present invention further relates to a method for preparing these calcium-supplemented juice products," (*id.*, col. 4, lines 5-6). Consistent with the mandate of the Federal Circuit, however, these portions of the specification cannot operate to limit the scope of the surviving product claims.[4]

The same is true for the statements from the '847 patent's prosecution history upon which

---

[2]        "App." refers to the Appendix previously filed in support of P&G's Opening Claim Construction Brief.

[3]        P&G is not asserting the process claims of the '963 patent against Coca-Cola in this litigation.

[4]        These portions of the specification relating to the process may serve other purposes, however, such as describing the "preferred" method of achieving the claimed product, or "enabling" one of skill in the art to achieve a claimed product.

- 3 -

Coca-Cola repeatedly relies.  During the prosecution of P&G's original application, the Examiner

raised questions about both the product claims and the process claims.  When she did so, however,

she always made clear which of those claims she was discussing.  For example, in the first Office

Action, the Examiner discussed the process claims (claims 19-28) separately from the product

claims (claims 1-18) and offered distinctly different reasons for rejecting the two sets of claims.

(*Compare* App., Ex. 9 at PGJ0013913-13914 to *id.* at PGJ0013915.)  Likewise, in the Examiner

Interview Summary Record, the Examiner indicated that the discussion during the interview

related to claim "19 as typical of ***method*** claims."  (*Id.* at PGJ0013917 (emphasis added).)[5]  P&G

similarly went to great lengths during prosecution to distinguish between the two types of claims

in its communications to the Examiner.  (*Compare id.* at PGJ0013928-13932 to *id.* at

PGJ0013932-13934.)

Coca-Cola's arguments based on the prosecution history of the '847 patent are grounded

entirely on statements that related solely to the then-pending process claims, not the product

claims that ultimately issued as the '847 patent.  Coca-Cola's repeated mischaracterization of the

invention of the '847 patent intentionally disregards these carefully-drawn distinctions.  In so

doing, Coca-Cola attempts to lead the Court into the domain of reversible error.

**III.    COCA-COLA'S INTERPRETATION OF THE PHRASE "ACID COMPONENT COMPRISING A MIXTURE OF CITRIC ACID AND MALIC ACID" VIOLATES EACH OF THE FEDERAL CIRCUIT'S ESSENTIAL CLAIM CONSTRUCTION TEACHINGS**

**A.    Coca-Cola's Claim Interpretation Ignores The Plain Meaning Of The Word "Mixture"**

It is well-settled that "[i]n construing claims, the analytical focus must begin and remain

centered on the language of the claims themselves, for it is that language that the patentee chose to

use to particularly point out and distinctly claim the subject matter which the patentee regards as

---

[5]    "Process claims" are frequently and interchangeably referred to as "method claims."

his invention." *Texas Digital Sys.*, 308 F.3d at 1201-1202 (quotation omitted).  To determine the

meaning of claim language, the Federal Circuit has instructed that "[d]ictionaries, encyclopedias

and treatises, publicly available at the time the patent is issued, . . . may be the most meaningful

sources of information to aid judges in better understanding both the technology and the

terminology used by those skilled in the art to describe the technology." *Id.* at 1202-1203.

Indeed, the Federal Circuit has indicated that there is a "presumption in favor of [the] dictionary

definition." *Id.* at 1204.

        In view of this basic principle, it is clear that Coca-Cola's proposed interpretation of the

phrase "acid component comprising a mixture of citric acid and malic acid" is erroneous.  Coca-

Cola asks this Court to construe this phrase as requiring the separate step of adding citric acid and

malic acid to juice (either directly or through a premix).[6]  Apparently recognizing that the word

"added" appears nowhere in this phrase, Coca-Cola focuses initially on the word "mixture" and

selectively identifies a single dictionary definition that purportedly supports its assertion that the

claims of the '847 patent require the act of mixing added ingredients.  (*See* Coca-Cola Br. at 7.)

However, even a cursory review of contemporaneous dictionaries offers numerous alternative

definitions of "mixture" that impose no such requirement.  *See* Supplemental Appendix to The

Procter & Gamble Company's Response to The Coca-Cola Company's Brief on the Meaning of

Disputed Claim Terms ("Supp. App."), Ex. 1, THE AMERICAN HERITAGE DICTIONARY OF THE

ENGLISH LANGUAGE NEW COLLEGE EDITION (1982) (mixture 2: "Anything consisting of diverse

elements"; 5: "*Chemistry.*  Any composition of two or more substances that are not chemically

bound to each other"); Ex. 2, THE RANDOM HOUSE COLLEGE DICTIONARY REVISED EDITION

(1982) (mixture 2: "any combination of contrasting elements, qualities, etc."; 3: *Chem., Physics.*

---

[6]        It is unclear from Coca-Cola's Brief whether Coca-Cola believes that the claims should be construed as
requiring the preparation of a premix of calcium and acids that is then added to the base juice or as requiring just that
citric acid and malic acid be added to the base juice.  Either construction is flawed for the reasons set forth herein.

an aggregate of two or more substances that are not chemically united and that exist in no fixed proportion to each other. *Cf.* compound").[7] The Federal Circuit has made clear that where, as here, "more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Texas Digital Sys.*, 308 F.3d at 1203 (citing *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001) (holding that the claim term "portion" may be interpreted in accordance with the dictionary definitions to encompass both "separate" and "integral" parts of an object)).

It is not permissible simply to ignore, as Coca-Cola does, these alternative definitions of "mixture". Rather, it must be assumed that the patentee intended by its use of the word "mixture" to incorporate each definition and thereby to encompass products in which citric acid and malic acid were merely two elements of the juice, as well as those in which citric acid and malic acid may have been separately combined and then added to the juice. This is entirely consistent with P&G's construction of the phrase "an acid component comprising a mixture of citric acid and malic acid" as requiring that the acid component portion of the beverage to include at least citric acid and malic acid, whether naturally present, added, or both. Thus, far from ignoring the claim term "mixture" (as Coca-Cola repeatedly and erroneously suggests), P&G's proposed construction is the only one that gives full meaning to the term.

### B.    Coca-Cola's Proposed Claim Construction Impermissibly Inserts Words Into The Claims

It is well established that rewriting claims by inserting (or deleting) words is improper.

---

[7]      These definitions are consistent with a chemistry textbook from the time of the '847 patent, which explains that:

> Mixtures are combinations of two or more pure substances which retain their identities in the mixture. A mixture may consist of elements, of compounds, or of a combination of elements and compounds. Mixtures are characterized by a variable composition: the individual components may be present in any quantity.

(Supp. App., Ex. 3, Ernest R. Toon, et al., FOUNDATIONS OF CHEMISTRY (1968) at 48-49 (characterizing "raw milk" as a mixture)).

*See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1115 (Fed. Cir. 2002) ("[T]his court will not rewrite claims"); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee"). For example, "modifiers will not be added to broad terms standing alone." *Johnson Worldwide Assoc.*, 175 F.3d at 989. Adoption of Coca-Cola's proposed claim construction, however, would require the Court to violate this most basic rule. Given that the plain meaning of "mixture" does not require the ***addition*** of any ingredients, the only way for Coca-Cola's construction to survive is for the Court to construe the language of Claim 1(b) as follows:

| Claim | Coca-Cola's Interpretation |
|---|---|
| "an acid component comprising a mixture of citric acid and malic acid" (App., Ex. 1, col. 13, lines 20-22) | an acid component comprising a mixture of ***added*** citric acid and ***added*** malic acid |

Indeed, Coca-Cola uses the word "added" with emphasis in its brief no less than 80 times. But this word appears nowhere in the relevant portion of the claims.

The Court should be particularly reluctant to read the word "added" into Claim 1(b), given that surrounding claim language indicates that the omission of the word "added" from that claim limitation was deliberate. *See ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). The preamble to Claim 1 of the '847 patent states:

> A calcium-supplemented single-strength fruit juice beverage, which
> is substantially free of ***added*** protein and which comprises:
>                         * * * *

(App., Ex. 1, col. 13, lines 15-17.) From this, it is clear that the patentee knew how to use the word "added" in the same claim when he desired to. Thus, its absence from Claim 1(b) can only mean that the patentee intended ***not*** to limit the claim only to products that included "added" citric

acid and malic acid.  Adoption of a construction that reads the word "added" into the language of

Claim 1(b) would, therefore, be unjustified.

**C.    Coca-Cola's Effort To Read The Specification And The Prosecution
History Into The Claims Constitutes An Improper Attempt To
Narrow The Scope Of The Claims Of The '847 Patent**

Unable to find support for its proposed claim construction in the ordinary meaning of the

claim language, Coca-Cola resorts to wrenching excerpts of the specification and prosecution

history out of context and asserting that these isolated quotes require that the claims be narrowed.

The Federal Circuit, however, has repeatedly affirmed the long-standing principle that limitations

from the specification of the patent or the prosecution history should not be read into the claims

absent special circumstances not present here.  *See, e.g., Teleflex, Inc.,* 299 F.3d at 1326

("[C]laims must be read in view of the specification, but limitations from the specification are not

to be read into the claims"); *Johnson Worldwide Assoc.,* 175 F.3d at 989-990 (holding that claim

terms "cannot be narrowed by reference to the written description or prosecution history unless the

language of the claims invites reference to those sources"); *Renishaw Plc v. Marposs Societa' Per*

*Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998) (describing as a "claim construction canon" the

principle that "one may not read a limitation into a claim from the written description").  A

statement in the specification or prosecution history only narrows a claim beyond its literal scope

where the patentee has "demonstrated an intent to deviate from the ordinary and accustomed

meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic

record using words or expressions of manifest exclusion or restriction, representing a clear

disavowal of claim scope."  *Teleflex,* 299 F.3d at 1326; *Inverness Med. Switzerland GmbH v.*

*Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002) (disclaimer must be "clear

and unambiguous").  Nowhere in either the specification or the prosecution history did the

patentee make any such statement limiting the scope of the product claims of the '847 patent to

products containing ***added*** citric acid and ***added*** malic acid.

1.     **Nowhere in the specification of the '847 patent are there any "words or expressions of manifest exclusion or restriction" disclaiming products made without the addition of citric acid and malic acid**

a)     *Coca-Cola improperly seeks to limit the claims to the preferred method disclosed for making the claimed products*

In support of its assertion that the '847 patent requires the use of a premix addition of citric acid and malic acid, Coca-Cola relies almost entirely on portions of the specification that expressly relate to the ***preferred method*** for making the products claimed by the '847 patent. (*See* Coca-Cola Br. at 10-11 (citing excerpts from portion of specification entitled "D. Method for Preparing Calcium Supplemented Fruit Juice Products"), 16-18 (same).) As an initial matter, Coca-Cola's reliance on these portions of the specification once again ignores that these statements were originally made primarily in support of the process claims that were part of the same application from which the '847 patent derived. They were not intended to limit the product claims that ultimately issued as the '847 patent.

In arguing to the contrary, Coca-Cola makes two errors. First, it mischaracterizes the preferred methodology for making the claimed products as the preferred embodiment. As has been explained, the '847 patent claims a product, not a process. Therefore, the description of the premix process merely describes the preferred method for making products of the claimed invention. Where, as here, a specification for a product patent describes a method for making the claimed product, the Federal Circuit has rejected efforts to limit the claims to products made by that method. *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371-1372 (Fed. Cir. 2003) (concluding that lower court erred in construing product claim as limited by the preferred method of manufacture described in the specification); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1329 (Fed. Cir. 2003) (rejecting argument that claims directed to a recombinant DNA product should be limited by how the product is made given the "evidence that both the patentee and the examiner viewed the claims that ultimately issued as

- 9 -

lacking a process component"); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1541 (Fed. Cir. 1983) (error to read into product claims portions of specification that described a process that was the subject of a related patent).[8]

Even if the description of the premix process could properly be characterized as a preferred embodiment, however, Coca-Cola's effort to limit the scope of the claims to products made by that process ignores the large body of binding precedent holding that claims are not to be limited to preferred embodiments of an invention discussed in the specification. *See Apex, Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003) (rejecting defendant's "classic attempt to limit the scope of a claim limitation to the preferred embodiment"); *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1301 (Fed. Cir. 2003) (holding that "statements from the description of the preferred embodiment are simply that -- descriptions of a preferred embodiment" and do not limit or narrow the scope of the invention); *Tate Access Floors, Inc. v. Maxcess Technologies, Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("[P]articular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments").[9]

---

[8]      The holding of *Stratoflex* is particularly on point.  In that case, as here, the patentee had filed a patent application that contained claims directed to a product as well as a process for making that product.  *Id.* at 1533. During prosecution, the Examiner imposed a restriction requirement, as a result of which the patentee had to elect which of the claims it wished to prosecute.  *Id.*  The patentee chose the product claims, which subsequently issued and were the subject of the litigation.  *Id.*  The patentee subsequently filed another application for the process claims, which issued as a separate patent.  *Id.*  Adopting a position similar to that advocated by Coca-Cola here, the district court construed the claims of the product patent as including limitations from the related process patent.  *Id.* at 1541. The Federal Circuit reversed based on its unequivocal conclusions that this construction was improper and that whether the defendant employed a different process in forming its products was "irrelevant".  *Id.*

[9]      Coca-Cola primarily relies on *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) to support its reading of limitations from the specification into the claims.  (*See* Coca-Cola Br. at 14-15.)  However, in *SciMed* the specification clearly stated that "all embodiments of the present invention" contained the disputed feature.  No such express representation is present in the '847 patent specification.  Indeed, given the '847 patent specification's unambiguous statement that "[c]alcium-supplemented fruit juice beverages and juice concentrates of the present invention can be prepared by other methods," (App., Ex. 1, col. 11, lines 9-11), the opposite is true.  The other cases Coca-Cola cites are similarly distinguishable.  *See J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1365 (Fed. Cir. 2001) (finding disclaimer of broad claim construction where patentee cancelled broad claims in response to examiner's rejection and substituted narrower ones); *Cultor Corp. v. A.E. Staley Mfg.*, 224 F.3d 1328, 1331 (Fed. Cir. 2001) (finding disclaimer where patentee expressly distinguished its ***process*** from prior art ***processes*** based on presence of feature which it now sought to read out of claims).

Indeed, even where a specification sets forth only one embodiment, the Federal Circuit has refused to limit the scope of the claims to that embodiment. See *Golight, Inc. v. Wal-Mart Stores, Inc.*, Civ. A. No. 02-1608, 2004 WL 77933, at * 4 (Fed. Cir. Jan. 20, 2004) ("[W]e have outright rejected the notion that disclosure of a single embodiment necessarily limits the claims"); *Sunrace Roots Enter. Co.*, 336 F.3d at 1305-1306 (holding that simply because patentee was focused primarily on one embodiment of his invention, where there was no language in the patent expressly limiting the claims to that embodiment, it was error to construe the claims as limited to that embodiment).[10]

Application of these fundamental principles to this case compels rejection of Coca-Cola's proffered claim construction. P&G most assuredly does not dispute that the preferred method of practicing the invention of the '847 patent involves the formulation of a premix of acids and calcium to form a meta-stable solution of solubilized calcium, which is then added to juice. (*See* App., Ex. 1, col. 11, lines 26-30.) However, the specification expressly states that "[c]alcium-supplemented fruit juice beverages and juice concentrates of the present invention ***can be prepared by other methods***." (*See* App., Ex. 1, col. 11, lines 9-11 (emphasis added).) The specification goes on to identify several other methods of making the products of the claimed invention, at least one of which does not require the addition of citric acid and malic acid. (*See id.*, col. 11, lines 11-26.) Accordingly, Coca-Cola's characterization of the specification as

---

[10]     The cases that Coca-Cola cites to the contrary are readily distinguishable. In *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1138-1139 (Fed. Cir. 2003), the Court restricted the claims to the preferred embodiment because during prosecution of the patent, both the applicant and the examiner characterized the patent as similar in scope to another patent that was expressly limited to that embodiment. In *Watts v. XL Systems, Inc.*, 237 F.3d 877, 882-883 (Fed. Cir. 2000), the Court limited the asserted claims to the preferred embodiment because the specification characterized the invention as utilizing that embodiment and because the applicant explicitly distinguished prior art from the claimed invention based on the features of the preferred embodiment. In *In re Baker Hughes, Inc.*, 215 F.3d 1297, 1302-1303 (Fed. Cir. 2000), the Federal Circuit concluded that the PTO had construed the claims too broadly because both the dictionary definitions of the terms at issue as well as the specification supported a narrower reading. In *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295 (Fed. Cir. 1999) and *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999), the specifications at issue described the preferred embodiment as the invention itself. None of these cases apply here, where the plain meaning of the claims supports a reading of the claims not limited to the preferred methodology, both the specification and the prosecution history distinguished between the claimed products and the preferred methodology, and the specification expressly stated that other methods could be used to make the claimed products.

disclaiming products made without the addition of citric acid and malic acid is wholly inaccurate.

> **b)** **The portions of the specification directed specifically to the product claims at issue contain no reference to "added" citric acid or malic acid**

Notwithstanding Coca-Cola's repeated references in its brief to "added acids," examination of the portion of the specification directed specifically to the claimed products reveals a complete absence of any requirement that citric acid and malic acid be ***added***. As Coca-Cola correctly notes, the specification states that:

> A key component in the fruit juice beverages and juice concentrates of the present invention from the standpoint of solubilizing calcium is the acid component. This acid component comprises a mixture of citric acid and malic acid. These acids can be present in their undisassociated form, but are typically present as the respective citrate and malate species. If desired, other edible acids such as phosphoric acid, fumaric acid, and the like can also be included in the fruit juice beverages and juice concentrates of the present invention. Preferably, the acid component consists essentially of a mixture of citric acid and malic acids.

(App., Ex. 1, col. 5, lines 56-68). Contrary to Coca-Cola's suggestion, however, nowhere does this portion of the specification state or suggest that the acid component requires "***added*** citric and malic acids for calcium solubilization." (Coca-Cola Br. at 2-3 (emphasis added).)

The specification continues:

> The level at which the acid component (***hereafter total acids***) is present depends on the fruit juice product involved, the level of calcium included, as well as the taste properties desired. (For the purposes of the present invention, 'total acids' include those naturally present, plus ***any*** acids added.)"

(App., Ex. 1, col. 6, lines 1-6 (emphasis added).) Coca-Cola's interpretation of the claims as requiring, at a minimum, the addition of citric acid and malic acid simply ignores the use of the word "any" in the above-quoted parenthetical. In fact, the use of the word "any" highlights the fact that "total acids" may consist solely of acids that are naturally present, and does not require that any acids be added. In a futile attempt to reconcile its claim construction with this language, Coca-Cola seeks to rewrite this passage as follows:

- 12 -

| Specification | Coca-Cola's Rewrite |
|---|---|
| "For the purposes of the present invention, 'total acids' include those naturally present, plus any acids added." (*Id.*, col. 6, lines 4-6.) | "'[T]otal acids' means the level of acids naturally found in the base juice, the ***added*** 'mixture of citric acid and malic acid' (aka 'Acids' depicted in the Figure), and any other optional edible acids . . . that are added to the base juice." (Coca-Cola Br. at 12.) |

Clearly, Coca-Cola's interpretation of this passage completely warps the language of the specification and cannot stand.

Moreover, in discussing the weight ratio of citric acid to malic acid in the product, the specification states:

> The weight ratios of citric acid to malic acid ***in the acid component*** can vary, especially depending upon the flavor and sourness effects desire, and the fruit juice used. Generally, the weight ratio of citric acid to malic acid can be from about 5:95 to about 90:10 over the entire range of fruit juices.

(App., Ex. 1, col. 6, lines 19-23 (emphasis added).) This is the only portion of the specification that discloses the same weight ratio as that set forth in Claim 1(b), and nowhere in this passage is there any reference to "added" acids. Rather, this passage expressly states that the weight ratio at issue is that of citric acid and malic acid "in the acid component," which is defined in the immediately preceding paragraph as "total acids." (*Id.*, col. 6, lines 1-2.) Thus, it is clear that the identical language in Claim 1(b) refers to the ratio of citric acid and malic acid in the final product, and does not indicate in any manner that citric acid and malic acid must be added in that ratio.

Indeed, throughout the specification, when the patentee wanted to refer to "added" ingredients, he did so clearly and expressly. For example:

- In discussing the calcium component of the claimed products, the specification states "[t]he key nutritional component ***added*** to the fruit juice beverages and juice concentrates of the present invention is calcium." (*Id.*, col. 5, lines 20-22 (emphasis added).)

- In discussing the sugar component, the specification explains that "in the case of extended juice products, sugar is typically ***added***, usually in the form of sucrose or high fructose corn syrup." (*Id.*, col. 6, lines 36-39 (emphasis added).)

- 13 -

- With respect to the limitation on the amount of protein, the specification states "[f]or fruit juice beverages of the present invention, the amount of ***added*** protein is generally no more than about 0.1% by weight. Preferably, these beverages and concentrates contain no ***added*** protein." (*Id.*, col. 7, lines 16-20 (emphasis added).)

In sum, these examples demonstrate that the patentee knew how to distinguish between ingredients that were or were not to be "added". In the case of citric acid and malic acid, there is nothing in the pertinent portions of the specification that requires these ingredients to be added to the claimed beverages and concentrates.

        *c)*     ***The specification confirms that P&G's proposed construction is the proper one***

The portions of the specification describing the product claims of the '847 patent confirm that the critical component of Dr. Heckert's invention is the ultimate proportion of citric acid and malic acid in the final beverage and that such acids may come from natural sources, extraneous sources, or both. Perhaps the clearest indication that the construction proposed by P&G must be correct comes from the statement in the specification that "[o]range juice ***naturally*** contains ***a mixture of citric acid and malic acid***." (App., Ex. 1, col. 2, lines 16-18 (emphasis added).) Inarguably, this statement is not referring to citric acid and malic acid that have been added to juice. Rather, it indicates that some portion of orange juice is naturally comprised of a mixture of these acids. The identical language – an acid component comprising "a mixture of citric acid and malic acid" – appears in Claim 1(b). Therefore, the only plausible interpretation of this claim language is that it refers to that portion of the final product that is in the form of acid and includes at least citric acid and malic acid. This interpretation is also consistent with the plain meaning of the word "mixture" as evidenced by the numerous dictionary definitions discussed earlier.

In contrast, the fatally flawed nature of Coca-Cola's proposed claim construction is revealed by the very portion of the specification that Coca-Cola cites in supposed support of its position. Coca-Cola contends that "the claimed beverage contains a specified amount of an 'acid component' comprising both the acids naturally present in the base juice and a 'mixture' of acids

- 14 -

discretely added to the base juice in the defined ratio [5:95 to 90:10]." (Coca-Cola Br. at 8.)  In

support, Coca-Cola cites col. 8, lines 19-21 from the portion of the specification that describes the

preferred method for making the claimed invention.  The cited passage states that "an acid

component comprising citric acid and malic acid (Acids) is typically dissolved in the appropriate

quantity of water. . . ."  However, Coca-Cola deliberately omits the language appearing three lines

later in the specification, which explains that "[g]enerally, this acid component comprises from ***0***

to about 90% ***by weight citric acid*** and from about 10 to ***100% by weight malic acid***."  (App., Ex.

1., col. 8, lines 24-26 (emphasis added).)  In other words, when describing the preferred method of

making the claimed invention, the specification suggests that one could add as little as 0% citric

acid and as much as 100% malic acid, *i.e.*, a ratio of citric acid:malic acid of 0:100.  (*Id.*)  But,

when describing the composition of the final product, Claim 1(b) requires that the presence of at

least 5% citric acid and at most 95% malic acid, *i.e.*, a ratio of 5:95.  (*Id.*, col. 13, lines 22-23.)

This discrepancy compels the conclusion that the "acid component comprising a mixture of citric

acid and malic acid" of Claim 1(b) must be different from the "acid component" of the preferred

method.  Coca-Cola's attempt to equate the two is misguided.

    Moreover, even in the context of the specification's description of the preferred

methodology, it is apparent that Coca-Cola's claim construction is wrong.  Coca-Cola contends

that Claim 1(b) requires the addition of citric acid and malic acid in a weight ratio of from about

5:95 to about 90:10.  (Coca-Cola Br. at 8.)  If Coca-Cola's argument were correct, it would mean

that, to practice the claimed invention, one would always need to add both citric acid ***and*** malic

acid.  However, the specification makes it clear that this is not the case even under the preferred

methodology.  That is, col. 8, lines 24-26 indicate that, in applying the preferred premix method of

making the claimed invention, one could add "from ***0*** to about 90% by weight citric acid."  (App.,

Ex. 1, col. 8, lines 24-26 (emphasis added).)  In other words, under the preferred method, one

could make the claimed invention by adding malic acid alone (*i.e.*, 0% citric acid).  As a result,

adoption of Coca-Cola's proposed claim construction requiring the addition of ***both*** citric and

malic acid would exclude the preferred methodology for obtaining the claimed invention described

in the specification, an illogical result, at best. This basic flaw provides yet another reason Coca-

Cola's proposed claim construction should be rejected.

> **2.    There is no "clear and unambiguous disavowal" in the prosecution history of products in which the acid component consists exclusively of naturally-present citric acid and malic acid**

>> ***a)    Coca-Cola confuses statements made in the prosecution history concerning the process claims with those made concerning the product claims***

In constructing its argument that the prosecution history supports its construction, Coca-

Cola repeats the same error it makes with respect to the specification, again relying almost entirely

on portions of the prosecution history describing the process claims that were part of the original

application from which the '847 patent issued. As an initial matter, it is well-accepted that one

application may lead to the issuance of multiple patents. 35 U.S.C. §§ 120, 121. Thus, statements

or arguments made in connection with one application may not apply to different claims in a

separate application. *See Biogen*, 318 F.3d at 1139.[11]

Indeed, the prosecution history reveals that both P&G and the Examiner consistently

recognized the differences between the two types of claims in P&G's original application. For

example, in the first Office Action, the Examiner rejected the ***product*** claims as unpatentable over

U.S. Patent 3,114,641 (Sperti) in view of Japanese Patent Document 54-8767 (Kaji), while she

rejected the ***process*** claims as unpatentable over U.S. Patent 4,551,342 (Nakel) in view of Sperti.

Thereafter, on March 2, 1987, Dr. Heckert, along with others from P&G, met with the Examiner

---

[11]    Notwithstanding this, Coca-Cola urges the Court to read limitations from the '963 patent into the claims of the '847 patent. (*See* Coca-Cola Br. at 23, n. 8). As authority for this proposition, Coca-Cola cites two cases that pre-date the landmark *Markman* decision by more than 70 years, and, therefore, are hardly reliable statements of current claim construction principles. *See Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668 (1921); *McClain v. Ortmayer*, 141 U.S. 419 (1891). The third, *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997), is distinguishable because in that case, unlike here, the plaintiff had asserted two related product patents against the defendant and the patentee had made similar statements of disclaimer during the prosecution of both patents).

and performed various demonstrations intended to illustrate the advantages of the premix process (claims 19-27) over other possible processes for making calcium-supplemented fruit juices and concentrates. According to the Examiner, the demonstrations "[c]ompared pre-mix procedure with various procedures of direct addition." (App., Ex. 9 at PGJ0013917.) The Examiner further noted that the demonstration related to Claim "19 as typical of method claims." (*Id.*) Thus, contrary to Coca-Cola's unsupported assertions, it is evident from the Examiner's own remarks that she well understood the demonstrations to relate to the process claims of the original application, and not to the product claims that ultimately issued as the '847 patent. It is also apparent that the Examiner understood that there might be other ways of making the claimed products, as she expressly acknowledged that one possible conclusion to be drawn from the demonstrations was that the premix procedure was merely the "preferred" methodology. (*Id.*)

The prosecution history likewise demonstrates that P&G consistently differentiated between the product claims and the process claims. For example, following the March 2, 1987 interview, P&G submitted an Amendment Pursuant to 37 C.F.R. 1.111. (*See id.* at PGJ0013926-13935.) In this Amendment, P&G described the products of claims 1-18, (*see id.* at PGJ0013927), and then explained that these products "are ***preferably*** obtained by using what is referred to as the 'premix method,'" (*id.* at PGJ0013928 (emphasis added)). According to P&G, when processing juice in the large blend tanks typically used in commercial citrus juice operations and when using the particular sources of calcium that were identified in the then-pending process claims,[12] the premix method was preferred because it "avoids the ***potential*** problems which ***can*** be caused by direct addition of calcium sources to juice or juice concentrates" in those circumstances (*Id.* at PGJ0013928-13929 (emphasis added).) P&G went on to discuss how the demonstrations had

---

[12]     Significantly, the process claims of the original application specified three sources of calcium (*i.e.*, calcium carbonate, calcium oxide, and calcium hydroxide) to which the claimed method applied. (*See* App., Ex. 9 at PGJ0013891.) This limitation similarly appears in the '963 patent wherein these claims eventually issued. (*See* App., Ex. 10, col. 13, lines 27-30.) There is no such limitation in the product claims of the '847 patent, however, further highlighting the broader scope of those claims.

illustrated these "potential" problems and concluded that "[d]irect addition does not solve these problems," while "[t]he premix method of the present invention does." (*Id.* at PGJ0013928-13930.) Therefore, P&G clearly indicated that, although other methods were available to make the calcium-supplemented fruit juices and juice concentrates of claims 1-18, the premix method was more reliable in the circumstances described and therefore preferred.[13] In its Amendment, P&G also sought to distinguish the prior art cited by the Examiner from the claims of the present invention. (*See id.* at PGJ0013930-13934.) In doing so, P&G clearly differentiated its arguments concerning the process claims, (*id.* at PGJ0013928-13931), from those concerning the product claims, (*id.* at PGJ0013932-13934).

In sum, despite Coca-Cola's litigation-inspired arguments to the contrary, there is nothing in the prosecution history of the '847 patent that indicates that P&G intended its statements about the process claims to apply to the product claims, or that the Examiner understood this to be the case. Rather, P&G's statements to the Examiner, and the Examiner's remarks during prosecution, clearly and consistently distinguished between the two sets of claims.

> **b)      *Nowhere in the prosecution history did P&G assert – or even suggest – that the product claims require the addition of citric acid and malic acid***

At no time during the prosecution of the product claims did P&G state that its invention required the addition of citric acid and malic acid. As a result, Coca-Cola is left to argue that P&G *implicitly* made such a disclaimer based on interpretations of P&G's statements that are strained, at best. For instance, during prosecution of the '847 patent, the Examiner initially rejected the product claims 1-18 as obvious in view of Sperti in combination with Kaji. (*See id.* at

---

[13]      Coca-Cola seeks to interpret P&G's statements in this Amendment as an admission that only products made through the premix process are covered by the '847 patent. However, in the context of the entire Amendment, along with the patent specification, it is clear that P&G was simply summarizing what the demonstrations showed – that, although addition of calcium to juice directly (with or without added acids) was possible, it had to be done with care to avoid the problems described. Because the premix process consistently produced calcium-supplemented juice without such problems, it was understandably preferred. In any event, even if the premix process was the only known method of making the claimed products, there would be no legal basis for limiting the claims of the '847 patent to products made by this method. *See 3M Innovative Properties Co.*, 350 F.3d at 1371-1372.

PGJ0013915.) Sperti discloses extended juice products to which calcium chloride, among other things, can be added in very small amounts (*i.e.*, below the level claimed in the '847 patent). (*Id.* at PGJ0013899.) Kaji discloses a soft drink containing the salts from food organic acids, such as calcium citrate, calcium malate, calcium lactate, and calcium tartrate. (*Id.* at PGJ0013900.)

Contrary to Coca-Cola's contention, when P&G distinguished the Sperti reference, it did so based on the composition of the final products of that reference, without regard to the source of any acids that were present in those products. Specifically, P&G explained that the Sperti patent taught addition of only low levels of calcium to juice products, and that if the amount of calcium were increased to the minimum level required by the '847 patent, the resulting beverage would be too salty. (*Id.* at PGJ0013933.) In addition, P&G noted that "the Sperti et al ***extended juice products*** contain <u>at least 99%</u> citric acid/citrate combined, and <u>less than 1%</u> malic acid." (*Id.* at PGJ0013933-13934 (underlining in original; bold and italics added).) P&G's reference to the "extended juice products" of Sperti confirms that the cited ratio of citric acid to malic acid was calculated based on the proportion of those acids present in the final product (regardless of whether the acids were natural or added). (*See* Supp. App., Ex. 4.) Thus, P&G represented that the ratio of citric acid to malic acid in the ***<u>final product</u>*** was outside the ratio claimed in the '847 patent, and not, as Coca-Cola asserts, that the ratio of added acids fell outside that claimed by the '847 patent. Nowhere in its discussion concerning the differences between the '847 patent and Sperti did P&G state that Sperti ***<u>added</u>*** citric acid and malic acid greater than the weight ratio permitted by Claim 1(b). P&G's distinction over Sperti during prosecution, therefore, is entirely consistent with the proper construction of the language of Claim 1(b) as referring to the acid composition of the final product.[14] As such, it clearly does not and cannot constitute a "clear and

---

[14]    The Examiner also raised Sperti as a basis for rejecting the process claims of the original application. (*See* App., Ex. 9 at PGJ0013913-13914.) In response, P&G distinguished the premix process from the process of the Sperti patent. (*See id.* at PGJ0013930.) Contrary to Coca-Cola's assertion, (*see* Coca-Cola Br. at 35), P&G's comments in this context clearly do not constitute a disclaimer of products made through other methods.

unambiguous disclaimer" of products in which the only source of citric acid and malic acid is the base juice. *See Inverness Med. Switzerland GmbH*, 309 F.3d at 1372.

### D.    Statements By P&G And A Third Party In Other Patent Prosecutions Are Legally Irrelevant To Claim Construction And Should Not Be Considered

Unable to find support for its proposed claim construction in the claims or other permissible sources of intrinsic evidence, Coca-Cola resorts to after-the-fact remarks by P&G in European and Japanese patent prosecutions years after the issuance of the '847 patent. Not only are statements consistent with P&G's proposed claim construction, but under applicable Federal Circuit precedent, they constitute legally irrelevant extrinsic evidence.

It is well-established that, if the meaning of the claims can be discerned from the "intrinsic" evidence – *i.e.*, patent claims, the specification, and the prosecution history – then it is improper to refer to other, "extrinsic" evidence of any type. *See Sunrace Roots Enter. Co.*, 336 F.3d at 1307 (where the intrinsic evidence resolves any ambiguity about the construction of dispute claim terms, "consideration of extrinsic evidence is inappropriate"); *Storage Technology Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 832 (Fed. Cir. 2003) (district court's reliance on extrinsic evidence to limit claim scope was "impermissible"). The rationale for this prohibition is apparent. The claims, specification, and prosecution history constitute the public record of the patentee's claim. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Competitors, applying the established rules of claim construction, are entitled to rely on this public record to ascertain the scope of the patentee's claimed invention and, thus, to design around the claimed invention. *Id.* Allowing either the patentee or an alleged infringer to alter or change the public record by later-introduced extrinsic evidence would make this reliance on the public record meaningless. *Id.*

Extrinsic evidence in the form of statements made during foreign patent prosecutions has been particularly rejected by numerous other Federal courts. *See Illinois Tool Works ex rel. Simco*

*Div. v. Ion Systems, Inc.*, 250 F. Supp. 2d 477, 497 (E.D. Pa. 2003) (refusing to consider statements by patentee in prosecution of Taiwanese counterpart to patent-in-suit); *VLT, Inc. v. Artesyn Technologies, Inc.*, 238 F. Supp. 2d 339, 345 (D. Mass. 2003) (refusing to consider affidavits of inventor from related foreign patent proceedings and noting that "the Federal Circuit has never defined [such statements] as part of the 'intrinsic' evidence used to construe a claim," unless submitted in connection with a reissue proceeding in the United States); *Astra Aktiebolag v. Andrx Pharma, Inc.*, 222 F. Supp. 2d 423, 466 (S.D.N.Y. 2002) (rejecting defendant's "improper reliance" on statements made in various foreign jurisdictions concerning related foreign patents).[15] For this reason alone, Coca-Cola's reliance on comments that P&G made in European and Japanese patent proceedings are misplaced.

       Moreover, the evidence to which Coca-Cola refers does not support its position in any event. As an initial matter, the requirements for patentability in Europe and Japan, while similar, are not the same as in the United States. Accordingly, attempting to attribute the same legal significance to statements made by P&G in connection with these foreign proceedings as is given to statements made in connection with prosecution of a patent in the United States is precarious, and precisely the reason why the Court should be reluctant to accept such extrinsic evidence. Moreover, in excerpting a single paragraph from a 23-page submission to the European Patent Office, Coca-Cola completely ignores other statements made by P&G in the same document that are consistent with the claim construction P&G is advocating here. In preparing to address the

---

[15]       The cases that Coca-Cola cites as authority for its reference to foreign patent proceedings are factually distinguishable from the instant matter. In *Glaxo Group Ltd. v. Ranbaxy Pharm., Inc.*, 262 F.3d 1333 (Fed. Cir. 2001), the patentee had submitted the foreign priority application containing a definition of the claim term at issue to the PTO in connection with the prosecution of the patent-in-suit. In *Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003), although the Federal Circuit made reference to statements by the patentee in a foreign proceeding, there is no indication that the Court relied on those statements for purposes of claim construction. Instead, the Court merely noted that those statements were consistent with ones that the patentee had made to the PTO during prosecution of the U.S. parent application. *Id.* at 1371-72. In *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338 (Fed. Cir. 2000), the Federal Circuit made no specific ruling concerning the consideration of statements to foreign agencies for purposes of claim construction, simply holding that, based on the totality of the evidence, the district court's claim construction was proper. Therefore, these cases do not and cannot support Coca-Cola's reliance on such extrinsic evidence.

significance of the cited art (including Ayers and Kawai), P&G stated:

> The problem underlying the present invention is solved by a combination of features comprising the ***presence*** of a specific amount of solubilized calcium, a specific amount of an acid component comprising a specific mixture of citric acid and malic acid, a specific sugar content and a maximum amount of chloride ions and the fact that the products are substantially free of added protein.

(Coca-Cola Br., Ex. 15 at 11.)  Nothing in this statement of the invention suggests that P&G believed its invention required the addition of citric acid and malic acid.  The same is true for P&G's statements in its communication to the Japanese Patent Office.  (*See* Coca-Cola Br., Ex. 17 at 2.)  As a result, the statements from these foreign proceedings cannot support a disclaimer of any aspect of the claims of the '847 patent.

Coca-Cola's reference to statements made by a third party, Tropicana, is even more tenuous.  Coca-Cola cites absolutely no legal authority that would permit reliance on such evidence to construe the claims of P&G's patent, and there is no justification for doing so.

### E.    Coca-Cola's Arguments Concerning The Validity Of The '847 Patent Under P&G's Proposed Claim Construction Are Irrelevant And Improper

Coca-Cola's arguments concerning written description and enablement are nothing more than a misguided attempt to convert its claim construction brief into a motion for summary judgment on the validity of the '847 patent.[16]

As a threshold matter, Coca-Cola's arguments concerning the validity of the '847 patent should play no role in the determination of the scope of the claims of the '847 patent.  The Federal Circuit has made it clear that, although claim language should generally be construed to preserve validity, where the meaning of claim language is clear, the Court should afford the patentee the full breadth of the claim language, without regard to the impact such a construction might later

---

[16]    In an apparent attempt at misdirection, Coca-Cola makes other irrelevant assertions concerning P&G's purported testing of Coca-Cola's products and its failure to charge Coca-Cola with infringement prior to the filing of this suit.  As with its arguments concerning the validity of the '847 patent, the facts relating to Coca-Cola's purported laches defense have absolutely no bearing on the construction of the claims of the '847 patent.  Accordingly, P&G will not respond substantively to these assertions at this time.

have on validity. *See Tate Access Floors*, 279 F.3d at 1367; *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("[I]f the only claim construction that is consistent with the claim's language and the written description renders the claim invalid, then . . . the claim is simply invalid").

Moreover, Coca-Cola's arguments on validity are fundamentally flawed. First, in asserting that, under P&G's claim construction, the '847 patent would lack a sufficient written description, Coca-Cola misconstrues the written description requirement of 35 U.S.C. § 112. Section 112 requires that a patent specification describe the claimed invention in sufficient detail that one skilled in the art can reasonably conclude that, at the time of the original application, the inventor had possession of what he or she claimed. With respect to the '847 patent, the invention claimed was calcium-fortified fruit juice beverages and concentrates with specific compositional attributes. Coca-Cola does not seriously dispute that the patent specification adequately describes each of the limitations of Claim 1, other than those set forth in Claim 1(b). (*See* Supp. App., Ex. 5 at 305-307, 310-312.)[17] In contending that the specification lacks sufficient written description of Claim 1(b), Coca-Cola's contention mirrors its position on claim construction; that is, it asserts that the specification does not describe a ***method*** of making such products without adding acids. This argument again mistakes the ***product*** claims of the '847 patent with the ***process*** claims that were originally part of the same application, but ultimately issued as the '963 patent. As a product patent, the '847 patent is not required to describe each and every way of making the claimed invention. *See Amgen*, 314 F.3d at 1333 ("[U]nder our precedent, the patentee need only describe the invention as claimed, and need not describe an unclaimed method of making the claimed product"). In rejecting precisely the same argument that Coca-Cola makes here, the lower court in *Amgen* explained:

---

[17]    Indeed, Coca-Cola's expert conceded that the specification provides an adequate written description of calcium-supplemented fruit juice beverages with added citric acid and malic acid. (*See* Supp. App., Ex. 5 at 297.)

> When the claim is to a composition rather than a process, the written description requirement does not demand that the specification describe technological developments in the way that the claimed composition is made that may arise after the patent application is filed. . . . The written description inquiry, therefore, focuses on a comparison between the specification and the invention referenced by the terms of the claim – not comparison between how the product was made as disclosed in the patent and future developments of this process that might alter or even improve how the same product is made.

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 126 F. Supp. 2d 69, 150 (D. Mass. 2001), *aff'd*, 314 F.3d 1313 (Fed. Cir. 2003).[18] For the '847 patent specification to meet the written description requirement, therefore, it is enough that one of ordinary skill in the art would have understood the claims of the '847 patent to describe the elements of a finished product, without regard to how the specific example of that product described in the patent was manufactured.

Likewise, Coca-Cola misapprehends the statutory enablement requirement. 35 U.S.C. § 112 requires that the claimed invention be "enabled"; that is, the specification must describe how to make and use the full scope of the claimed invention. In this case, that means that the '847 patent must provide at least one method to make fruit juice beverages containing 0.05% - 0.26% by weight solubilized calcium (and meeting all the other limitations of Claim 1). As long as the specification discloses at least one method for making and using the claimed invention bearing a reasonable correlation to the entire scope of the claim, then the enablement requirement is satisfied. *Amgen*, 314 F.3d at 1335-36. Much like Coca-Cola in this case, the defendant in *Amgen* sought to import process limitations into the product claims of the patent at issue there. *Id.* at 1325. When the defendant's claim construction was rejected, it argued (like Coca-Cola here) that the claims did not enable products made with a different process. *Id.* at 1334. Noting that "the law makes clear that the specification need teach only one mode of making and using a claimed composition," the Federal Circuit rejected the defendant's argument and concluded that the failure

---

[18]    For this reason the testimony of Dr. Heckert concerning his awareness in 1986 of other methods for making the claimed products is wholly irrelevant. Dr. Heckert certainly did not concede that the invention of the '847 patent was limited to products made with a premix of citric acid and malic acid. (*See* Supp. App., Ex. 6.)

- 24 -

to disclose another method of making the claimed product was "legally irrelevant". *Id.* at 1335. The same result applies here. Coca-Cola's technical expert concedes that the specification enables at least one method of making products covered by the '847 patent. (*See* Supp. App., Ex. 5 at 335-336.) Thus, even if it were correct that the '847 patent only discloses one way of making the claimed invention,[19] that would suffice to meet the enablement requirement.

## IV.    THE DEFINITION OF "FRUIT JUICE BEVERAGE" IS UNDISPUTED

The parties evidently agree on the proper construction of the term "fruit juice beverage," and, therefore, there is no need for the Court to further construe this term. The dispute between the parties instead appears to concern the meaning of the word "drinkable," as it is used in the specification. (*See* App., Ex. 1, col. 4, line 46.) However, because this is not a claim term, it is not appropriate or necessary for the Court to attempt to construe this word now. Rather, this is a disputed issue of fact that should be resolved at trial by the trier of fact.

## V.    CONCLUSION

For the reasons stated herein and as set forth in P&G's Opening Claim Construction Brief, P&G respectfully requests that the Court construe the phrase "acid component comprising a

---

[19]    In fact, the assertion that the '847 patent provides only one way of making the invention and teaches away from other methods is incorrect. Although the premix method is clearly preferred, the '847 patent addresses the use of direct addition of a calcium source and acid, as well as direct addition of calcium alone, and provides guidelines for the direct addition of calcium in order to obtain a beverage within the claimed ranges. (*See* App., Ex. 1, col. 11, lines 9-30.) In light of the care needed to produce a calcium-supplemented juice beverage with other methods, the patent concludes the premix method is preferred. P&G's statements to the Examiner during prosecution are consistent. In no sense do P&G's statements in either the specification or the prosecution history concerning the difficulties of the alternate methodologies constitute a disavowal, clear or otherwise, of products made without the addition of acids.

mixture of citric acid and malic acid" in accordance with P&G's proposed construction, as set

forth in Exhibit A attached to P&G's Opening Claim Construction Brief.

Respectfully submitted,

THE PROCTER & GAMBLE COMPANY

By its attorneys,

/s/ Mark Vander Laan
Mark Vander Laan (Bar No. 0013297)
Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202-3172
(513) 977-8200

William F. Lee (admitted *pro hac vice*)
David B. Bassett (admitted *pro hac vice*)
Vinita Ferrera (admitted *pro hac vice*)
Mary Rose Scozzafava (admitted *pro hac vice*)
Richard W. O'Neill (admitted *pro hac vice*)
Benjamin Stern (admitted *pro hac vice*)
Hale and Dorr LLP
60 State Street
Boston, MA 02109
Dated: February 6, 2004                              (617) 526-6000

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above documents was served on this 6th
day of February, 2004 via e-mail by the Court's Electronic System and facsimile on the following
counsel of record:

Roger J. Makley, Esq.                    Robert L. Burns, Esq.
Coolidge, Wall, Womsley & Lombard        Finnegan, Henderson, Farabow, Garrett &
   Co., L.P.A.                              Dunner, L.L.P.
33 West First Street, Suite 600          Two Freedom Square
Dayton, OH 45402                         11955 Freedom Drive
                                         Reston, VA 20190-5675

/s/ Mark Vander Laan